\*FREDERICK CHAFFEE v. RUTLAND RAILROAD COMPANY
AND TRUSTEES.

*Preferred Stock. Dividend on, Ratified, Estoppel. The company cannot plead its own wrong. Action in name of Holder of Certificate.*

1. Two mortgages resting on the R. & B. R. R. Co., it being operated by the trustees of the second mortgage bondholders, a suit pending to foreclose the first mortgage, and during the pending of this suit a charter having been obtained for the defendant company, in the interest of the second mortgage bondholders, the defendant by corporate vote, under the authority of the charter, issued $4,300,000 of "preferred or guaranteed stock, commonly called preferred guaranteed stock," also, $2,500,000 of common stock, to liquidate the first mortgage bonds and other claims resting on the property. The charter provided that the said guaranteed stock should " be entitled to receive dividends from the earnings and income of the corporation;" that it "shall pay and shall be liable to pay such dividends;" that, "until declared, interest shall be added to each dividend;" and that no dividend shou'd be paid on the common stock " until a dividend is made on said preferred stock." The defendant having issued certificates of " scrip dividends" in "settlement of dividends" on the said preferred stock, in an action of assumpsit to recover the amount of some of said certificates. *Held,* that a preferred stockholder is not a creditor; that a creditor's lien is prior to the right of a stockholder; that a right to a dividend is not a debt; that dividends on preferred stock are payable only out of net earnings which are applicable to the payment of dividends; that a stockholder is not entitled to any dividend of the profits until all the debts are paid; that the stock and property of a corporation is a trust fund pledged for the payment of its debts; and that there is no right to declare a dividend until there is a fund from which it can properly be made.

2. But, the company having issued the certificates without objection by any stockholder or creditor, which certificates were convertible into the company's bonds on demand or at the option of the holder, the company having converted all or nearly all of the certificates into bonds, except the plaintiff's, having ratified them, and never having denied their validity, and having so acted that it is estopped to deny their validity, *general assumpsit, will lie to recover the amount of the certificates, the company on demand having refused both to convert them into bonds or to pay them;* and this is so although at the time the scrip dividends were issued the net earnings were insufficient to pay them, the current expenses, and the floating debt of the company, said debt having been very largely reduced when this suit was brought, and it not appearing that the same treatment of the plaintiff's certificates with the others would have embarrassed the company.

3. Having issued the certificates, ratified them, and all the other preferred stockholders having received the fruits thereof, *the company itself* cannot plead its

---

\* This case was argued twice before the full bench.

Chaffee v. Railroad Co.

own wrong in defence by showing that they were illegally issued, or that it had no authority to exchange bonds for certificates, it not appearing that this was necessary to protect itself from embarrassment, or creditors from loss.

4. The plaintiff was a stockholder, and so affected by constructive notice to a certain extent of the acts of the company and its officers, but in fact had no part in what was done; and, hence, stands in no such equal fault as to warrant a denial of remedy.

5. The certificates ran to the *holder*, went on the market, were purchased by the plaintiff; and the defendant had always treated him as though an original holder, and the certificates as running to *bearer*. *Held*, that the plaintiff could sustain the action *in his own name*; and that it was not a question of negtiability; but how the defendant had treated the certificates, &c.

6. All the issues of certificates were authorized by nearly, if not entirely, unanimous votes of the corporation, fo'lowed by votes of the directors. They were issued from time to time from 1872 to 1875, inclusive. The company never denied but always recognized their validity by its corporate action, the repeated votes of its stockholders and directors, the representations of its officers, authorized to issue them, and by the issuing of new bonds, even after the bringing of this suit, to take up the certificates. *Held*, that it was a ratification; and that the defendant was estopped from denying their validity.

7. The last two issues of certificates did not contain the convertibility clause; but they had a'ways been converted into bonds the same as the earlier numbers, and the president of the defendant,—the officer who had charge of converting them—told the plaintiff, before he purchased, that they were convertible into bonds, and showed him the stockholders' vote to that effect. *Held*, that they should be treated the same as the other certificates.

8. The company cannot now deny the considerati n in the certificates, having always treated them as though given in surrender of a dividend actually earned and warranted, and issued in settlement of dividends.

9. TRUSTEE PROCESS.—The Cheshire Railroad Company, one of the trustees named in the writ, is a foreign corporation. The process alleged that said company "has an authorized agent resident within the State of Vermont at Bellows Falls, in the town of Rockingham and the county of Windham and said State." Such allegation is sufficient to give the court jurisdiction, when legal service has been made.

10. The office of allegations by a trustees under section 1094, R. L., is not to present for trial the same issues raised and tried between the principal parties; and allegations for that purpose will be dismissed on motion.

11. Improper use of the term *ulra vires* referred to.

GENERAL assumpsit. Heard on the report of a referee, September Term, 1879, Rutland County, DUNTON, J., presiding. Judgment *pro forma* for the defendant. The case was referred to Hon. JONATHAN ROSS, who reported substantially the following facts. The action was brought to recover the amount of certain certificates. The following are copies:

Chaffee *v.* Railroad Co.

[No. 1.]
SCRIP DIVIDEND, RUTLAND RAILROAD, FEBRUARY 1, 1872.

RUTLAND RAILROAD COMPANY.

$.......... RUTLAND, VT., February 1st, 1872.
This certificate entitles the holder to the sum of... ................
Dollars, with interest thereon after date, in settlement of dividends on
the Preferred Guaranteed Stock of the RUTLAND RAILROAD COMPANY,
and is to be paid whenever the Company, from its earnings, shall have
extinguished its floating debt, and have a sufficient sum to pay the divi-
dend of which this Scrip is a part.

By a vote of the Company this Certificate may be exchanged on demand into seven
per cent. Income bonds of the Rutland Railroad Company at par, with adjustment of
interest.
No.......... ....................Treasurer.

[Nos. 2, 4 and 5, dated respectively Aug. 1, 1872, Aug. 1, 1873, and Feb. 2, 1874.]
SCRIP DIVIDEND, RUTLAND RAILROAD.

RUTLAND RAILROAD COMPANY.

$.......... RUTLAND, VT., August 1st, 1872.
This certificate entitles the holder to the sum of........... .......
Dollars, with interest thereon after date, in settlemeut of dividends ou
the Preferred Guaranteed Stock of the RUTLAND RAILROAD COMPANY,
and is to be paid at the option of the Company.
No.......... ....................Treasurer.

By vote of the Company this Certificate may be exchanged on demand into any
Bonds that the Company may issue.

[No. 3.]
SCRIP DIVIDEND. RUTLAND RAILROAD, FEBRUARY 1ST, 1873.

RUTLAND RAILROAD COMPANY.

$.......... RUTLAND, VT., February 1st, 1873.
This certificate entitles the holder to the sum of....................
Dollars, with interest thereon after date, in settlement of dividends on
the Preferred Guaranteed Stock of the RUTLAND RAILROAD COMPANY,
and is to be paid at the option of the Company, and convertible at the
option of the holder into the 8 per cent. First Mortgage Bonds of the
Company.
No.......... ....................Treasurer.

Nos. 6 and 7, dated respectively Aug. 1st, 1874, and Feb. 1st,
1875, were like Nos. 2, 4 and 5, except they did not provide for
their exchange into bonds.

There were two mortgages on the Rutland and Burlington R.
R. Co. The charter was to the second mortgage bondholders, or
in their interest; and the issue of preferred stock was intended
to be used to liquidate the first mortgage debt of the company,
and such claims as were resting on the property prior to the sec-
ond mortgage debt. The 8th and part of the 9th section of the
act of incorporation passed in 1876, are as follows :

" Sec. 8.    Said corporation shall be authorized, upon vote of their directors, to issue a preferred or guaranteed stock, for the purpose of satisfying, paying or purchasing prior claims or incumbrances upon or interest in said road and property, and not exceeding in amount the amount justly due upon said prior claims or incumbrances.    And such stock may be exchanged for such prior claims or incumbrances, upon such terms as may be agreed on.    And said preferred or guaranteed stock, when so issued, shall be entitled to receive dividends from the earnings and income of said corporation at the rate of seven per cent. per annum, payable semi-annually, free of United States tax, before any other dividends shall be made therefrom.    And said corporation shall pay and shall be liable to pay such dividends on said preferred stock semi-annually from their earnings or income.    And until declared, interest shall be added to each dividend from the end of the half year when the same shall be declared.    And no dividends shall be paid on the common stock of said corporation until a dividend is made on said preferred stock, nor while any semi-annual dividend on said stock or interest thereon herein provided for, remains undeclared.    And no mortgage of said road and property, or any part thereof, shall be made by said corporation that shall take precedence of said preferred or guaranteed stock in the application of the income of said corporation."

" Sec. 9.    No preferred or guaranteed stock shall be issued by said corporation, unless an equal amount of claims or incumbrances on said road and property prior to that of said corporation shall be thereby satisfied, retired or exchanged therefor."

Amendments were made to the charter, and are found in the acts of 1868, page 217 ; of 1870, page 339 ; and of 1872, page 381.    The defendant owed a floating debt, August 1st, 1868, $131,717.39 ;  Aug. 1st, 1869, $212,402.07 ;  Aug. 1st, 1870, $138,215.84 ;  Aug. 1st, 1871, $1,282,532.62 ;  Feb. 1st, 1872, $1,561,588.82 ;  Aug. 1st, 1872, $1,475,418.02 ;  Feb. 1st, 1873, $866,045.81 ;  Aug. 1st, 1873, $769,888.16 ;  Feb. 1st, 1874, $606,- 873 ;  Aug. 1st, 1874, $732,146.11 ;  Feb. 1st, 1875, $714,060.28 ; Aug. 1st, 1875, $656,015.45 ;  Feb. 1st, 1876, $823,794.14 ;  Aug. 1st, 1876, $413,711.20 ;  Feb. 1st, 1877, $361,375.99 ;  Aug. 1st, 1877, $314,710.85 ; Feb. 1st, 1878, $358,532.93 ;  Aug. 1st, 1878, $395,250.07 ;  Feb. 1st, 1879, $374,426.33 ;  Aug. 1st, 1879, (estimated) $340,000.

The defendant railroad had been leased, February 8th, 1871, to the managers and receivers of the Vermont Central and Vermont and Canada Railroads, and its income was from rents when the certificates were issued.    * It had issued $4,300,000 of pre-

* The vote by the stockholders authorizing the preferred stock was as follows:

" *Resolved,* That for the purpose of satisfying, paying, purchasing or exchanging the prior claims or incumbrances or interests in the Rutland & Burlington Railroad

8

ferred guaranteed stock, and $2,500,000 of common stock, prior to February, 1872. On April 28, 1870, it had also issued $500,-000 of its seven per cent. bonds; and on September 15th of the same year, $500,000 of eight per cent. bonds; both secured by mortgage on its rolling stock and equipments. The seven per cent. bonds were given as a *bonus* to the subscribers and owners of the preferred stock; the eight per cent. bonds were issued to equip and furnish the railroad, and pay debts contracted for that purpose.

As to the capacity of the defendant to pay the floating debt, current expenses and the certificates, the referee reported:

" From the foregoing facts I find that if the floating debt and current expenses were to be first paid out of rent or income received, the defendant has had no funds with which to pay the plaintiff's certificates, and had none at the time the demands were made. If the preferred stock was entitled to be paid dividends before the floating debt, the income of the company from rents at the time of the demands had been sufficient to pay all such certificates issued by the defendant. The rents received from Aug. 1, 1871, to Feb. 1, 1875—the period for which scrip certificates were issued in payment of dividends on the preferred stock—were more than enough to pay these dividends in cash if first applied thereto, and nearly or quite enough to pay in addition the interest on the equipment bonds and the first mortgage eight per cent. bonds sold.

" This question as to which has the first right to the income, is submitted to the court on the facts reported, as also is the question whether the plaintiff at the time of said demands or either of them, on the facts reported was entitled to receive eight per cent. first mortgage bonds for any, and if so for how many, of said certificates, and whether if entitled to receive such bonds, the refusal to furnish them, or to comply with his demands, entitled him to recover the amount of such certificates and interest of the defendant."

Company, that this company issue to the holders of such claims, certificates of preferred stock of this company, in shares of one hundred dollars each, equal in amount to the principal and interest on such claims, encumbrances or interests up to August 1st, 1867, agreeably to the act of the Legislature incorporating this company, securing to the holders of such stock, dividends upon the par value thereof, of three and one-half per cent., free of United States tax, payab e semi-annually, on the first days of February and August in each year, commencing on the first day of February, A. D. 1868."

As to the issuing of the certificates :

" At the annual meeting of the stockholders, holden January 30th and 31st, 1872, the company was found to have a floating debt of over a million and a half dollars.    This was a surprise to many of the preferred stockholders.    .    .  .    At this meeting the following resolution was passed :

' *Resolved,* That the  directors be authorized and are hereby instructed to prepare and issue to  the holders of  the  preferred stock, a scrip dividend of three and a half per cent., to date February 1st, 1872, upon forty-three thousand shares of preferred stock; and also that said directors are hereby instructed to issue, as  the  necessities of the road in  payment of accruing dividends, and the debt of the corporation may require, a seven per cent. bond, not exceeding twelve hundred thousand  dollars in amount, such bonds to bear date February 1, 1872, payable twenty years from date; with interest payable semi-annually, on the first days of February and August of each year, secured upon the income of the corporation, to be disposed of in liquidation of the debt, at not less than the par value, provided, that the scrip dividend upon the preferred stock shall in sums of not less than one hundred dollars, be at all times convertible into such seven per cent. bond, dollar  for  dollar of principal and interest until such  time as  the  corporation  shall  resume  dividends  payable in cash upon the preferred stock.'

" Accordingly the directors caused to be issued to the preferred stockholders certificates, of which No. 1 is a copy."

Also the following :

" *Resolved,* That Messrs. Edward Blake, A. W. Spencer and Jacob Edwards, as a committee of the stockholders, be appointed to act as an advisory committee with the directors, in matters relating to the finances of the corporation, with power to make such examination of the accounts and business of the company as may in their judgment promote the best interests of the stockholders.  Such committee to make report at a future meeting of the stockholders."

The advisory committee called a meeting of the stockholders, March 13th, 1872, to hear its report, and see whether the vote authorizing an issue of bonds not exceeding $1,200,000 should be modified or rescinded.    At the annual meeting the directors were also called upon to make and publish a report to the stockholders of the financial condition of the road to January 30th, 1872.

" At the said meeting and at other times the  preferred stockholders to some extent if not generally were claiming that they were entitled to the income and earnings of the property to the extent of the dividends on their preferred stock provided for by the charter, whether the floating debt was paid oȓ not.   The advisory committee, at  the  March meeting, reported on  this subject as follows :

' It has generally been understood that the preferred stock in the Rutland Railroad Company carried all the security of a first mortgage, and that was undoubtedly the intention when the charter was obtained, as the object was to offer the strongest inducements possible to the holders of the first mortgage bonds of the Rutland and Burlington Railroad, to surrender their bonds and take the preferred stock of the Rutland Railroad Company, and as between the preferred stock and the common stock, and *in the absence of any unsecured debt,* it is to all intents and purposes a first lien upon the property; but by the general law of Vermont, any legal indebtedness of the company would take precedence of it, and while no mortgage can be put upon the property as the charter now exists, the laws of Vermont leave no room to doubt that the rights of the preferred stock are subordinate to those of the creditors. We desire to set the stockholders right on this point before submitting our proposition.' This committee presented a plan to said meeting, and the president presented another plan. Both were for the relief of the company from its floating debt. The stockholders, after discussion, Voted, First, to appropriate the income of the road to the payment of the outstanding indebtedness, until it is provided for in the manner herein stated.' "

' Second, to rescind that portion of the vote passed at the last annual meeting of the company authorizing the issue of a seven per cent. bond, and the conversion of the scrip dividend, authorized by said vote, into seven per cent. bonds."

" Third, to pay future dividends on the preferred stock of the company by issuing to the holders thereof scrip (dividends) therefor as the same may become due, until the debts of the company are provided for, as herein stated.'

' Sixth, Voted, that in the event of the failure of the stockholders of this company to take the stock hereinbefore provided for, that the directors of the Rutland Railroad Company are hereby instructed to petition the General Assembly of the State of Vermont at its session in October. next, for such an amendment of their charter as will authorize the company to make and execute a mortgage on its franchise, railroad, depots, machine-shops, and property now under lease to the trustees and managers of the Vermont Central and Vermont and Canada Railroads, not including the rolling stock already mortgaged for the payment of five hundred thousand seven per cent., and five hundred thousand eight per cent. equipment bonds and exclusive of the steamboat property, as security for an issue of bonds, to be known as first mortgage bonds, and not to exceed in amount one million five hundred thousand dollars, redeemable within thirty years, and to bear interest at a rate not exceeding eight per cent. per annum, payable semi-annually in the city of Boston.' "

" The plaintiff, soon after this meeting, May 11, 1872, became the owner of quite an amount of the preferred stock, and continued to be such stockholder until January 28, 1878, when he transferred two hundred and twenty-five such shares, being all he owned ; but he never attended any of the stockholders' meetings while such owner ; nor did he attend the annual meeting in 1872 ; nor the special meeting holden in March of that year when the foregoing votes were passed."    .    .    .    .

" I find that during all the time since the organization of the

defendant corporation, the plaintiff has resided in the village of Rutland where the meetings of the stockholders of the company were held, and took the Rutland *Daily Herald* in which the proceedings of said meetings and the substance of the annual reports to the stockholders were published." . . . .

" May 4, 1872, at a regular meeting of the directors of the defendant, it was

' Voted, That scrip be issued in payment of the dividend for August next upon the preferred stock of this company, said scrip to be payable at the option of the company with interest at six per cent., and convertible into any bonds that the company may issue."

Accordingly the treasurer issued to the preferred stockholders certificates, of which No. 2 is a copy.

The directors obtained an amendment to the charter at the session of the Legislature, 1872, (Session Laws, page 382,) as follows :

"SECTION 1.    The Rutland Railroad Company, if it shall vote so to do, at a meeting of the stockholders called for that purpose, shall have power to issue their notes or bonds for the purpose of raising means *to pay the indebtedness of said company,* which notes or bonds shall bear interest at a rate not exceeding *eight per cent.,* and may be secured by mortgage, and in such manner as said company shall deem expedient."

" A stockholders' meeting was duly holden October 21, 1872, at which a mortgage of the property, specified in the vote of March, 1872, was authorized, and the same was duly executed to secure the payment of $1,500,000 of the defendant's bonds, having thirty years to run and bearing interest at the rate of eight per cent., payable semi-annually.    The bonds are called the first mortgage eight per cent. bonds, and were duly issued to the amount named.

The vote authorizing their issue provided that these bonds should " be sold only to retire an equal amount of claims against, or indebtedness of, the company now outstanding or in exchange therefor."

" The directors on the same day,"

" Voted, That the officers of this company be directed to notify the stockholders thereof and the holders of scrip and other forms of indebtedness of the company, that an eight per cent. mortgage bond, having thirty years to run, has been authorized by the stockholders in special meeting this day, to be issued, and that said bonds are ready for sale to the stockholders, or exchange with said holders of scrip, &c.

Such notice was duly published to the stockholders.    The directors at a meeting July 25, 1874,

" Voted, That the dividend on the preferred stock of this company, due August 1st, next, be paid in the scrip of this company in the same way and manner as dividends have been heretofore paid."

Accordingly certificates were issued of which No. 4 is a copy.

At a directors' meeting January 27th, 1874, it was voted, " That the matter of further issue of scrip be referred to the stockholders." At a stockholders' meeting holden the same day it was voted,

"That the scrip dividend to be hereafter declared be made convertible hereafter as heretofore into the eight per cent. bonds of the company at par, and that scrip shall be entitled to an interest of six per cent. thereon until converted or paid."

At a directors' meeting holden subsequently on the same day, it was voted " To pay the next dividend on the preferred stock in scrip on and after the 9th proximo." The treasurer issued to the preferred stockholders scrip certificate No. 5, in form and language in all respects like Nos. 2 and 4, except it was dated February 2d, 1874.

At a meeting of the directors holden, July 28, 1874, the following action was taken :

"Whereas, It was voted at a meeting of the stockholders of this Company, on the 27th of January, 1874, that the scrip dividend hereafter to be declared, be made convertible into the eight per cent. bonds of the company ; and whereas, the company is now compelled to secure a portion of its floating debt by a pledge of all its eight per cent. bonds now unconverted, it is voted by this board that until the floating debt of this company snall be so far paid that such bonds can be redeemed from any pledge for its floating debt the scrip hereafter to be issued shall not bear upon its face any contract for such convertibility." This action of the directors was known to many of the stockholders, but was not known to the plaintiff until after this suit was commenced.

Accordingly when the next certificates, No. 6—were issued, they did not contain the convertibility clause. January 27th, 1875, the directors in meeting,

"Voted, In accordance with instructions given the directors by the stockholders at their last annual meeting,—that the treasurer be directed to issue the scrip of the company in payment of the dividend due on the 1st day of February next on the preferred stock."

The treasurer issued, accordingly, certificates,—No. 7,—in form and language like No. 6, except the date.

The directors, July 26th, 1877, in meeting,

"Voted, Whereas certain promises have been given in relation to the conversion of scrip into bonds of the company amounting to about ten thousand dollars ($10,000), the president and treasurer are authorized to make such conversion, and thereafter no more of the scrip shall be converted, until the floating debt of the company is fully extinguished."

Also in another directors' meeting, December 6th, 1877, it was voted to offer such certificate-holders a six per cent. twenty years income bond in exchange for such certificates ; and also to author- ize the issue of such bonds, "provided that in the opinion of the counsel of the company there are no legal objections. Also that in so far as the president deems the company to have been pledged for the resumption of any portion of the scrip in bonds now on hand, he is authorized to take up and cancel such scrip in fulfill- ment of any such implied obligation." At a meeting of the direc- tors holden July 31, 1878, so much of the last named vote as " authorized the issue of twenty year bonds in exchange for divi- dend scrip" was rescinded and no action ever taken under it.

The referee found :

" All the votes of the stockholders and directors were duly spread upon the records of the company ; but it did not appear that the plaintiff ever knew of but one of them, that of the stock- holders in January, 1874. The plaintiff received scrip certificates as they were issued from time to time on the preferred stock owned by him and they have all been converted into the eight per cent. first·mortgage bonds. A large proportion of the scrip cer- tificates so issued have been so converted, amounting to over $1,000,000. In such conversions no distinction or difference has been observed between Nos. 6 and 7 and the earlier Nos. Nos. 6 and 7 have been converted into the bonds as readily as the earlier Nos. Considerable of this scrip was sold in the market, and was purchased by the president, treasurer, and some of the directors.

" The president received about $19,000 of such scrip certificates on preferred stock which he owned, and purchased quite a large amount of the same in the market, and had most of it converted into eight per cent. first mortgage bonds, and the balance of a few thousand dollars have recently been converted into the new five per cent. bonds.

" The scrip so purchased in market was converted by the company into the eight per cent. first mortgage bonds for the purchaser as readily as it was to the holders of the preferred stock to whom the scrip certificates thereon were issued. The plaintiff purchased quite a large amount of said scrip certificates in the market, and the company through its president and treasurer converted $10,000 of it into eight per cent. 1st mortgage bonds in the summer of 1877."    .     .      .      .

" January 5, 1877, the plaintiff's attorney for and in behalf of

the plaintiff took all the scrip certificates to the defendant's office in Rutland and there demanded of John B. Page the president, and J. M. Haven, the treasurer of the defendant, the before mentioned eight per cent. first mortgage bonds in exchange for said scrip and accrued interest. Both said Page and Haven declined so to convert them at that time, saying that the defendant had none of the first mortgage eight per cent. bonds on hand except such as were pledged as collateral security for the payment of some part of the defendant's floating debt, or such as it was necessary to use immediately for that purpose in renewal of such debt, but not always to the same party, but that they would so convert them in a short time and as soon as some of such bonds should be relieved from such pledge. He then demanded the money on said certificates and accrued interest. This they both peremptorily refused to pay."      .      .      .

" On July 15th, 1877, the plaintiff by his attorney repeated his former demand, except calling for the seven per cent. income bond in exchange for the certificates dated February 1st, 1872, to said Page and Haven.

" Said Page said he would convert the first four numbers in a few days, but could not at that time, for the reason before stated when demand was made. Said Haven said he would convert the first three numbers in a short time. Both declined to convert all the numbers later than those specified. The said attorney then demanded payment of all said certificates in money, which was absolutely refused."      .      .      .      .

" As appears from some of the votes of the defendant's directors before recited, and from other testimony, I find that said Page had the general direction of the conversion of scrip certificates into bonds."      .      .      .      .

" Said Page uniformly promised to make such conversion as soon as the bonds, eight per cent. first mortgage, could be redeemed from pledge for the company's floating debt, and said it would be in a short time. The exact dates of these interviews were not given, but I conclude they were subsequent to the passage of the vote of the directors heretofore recited, dated July 28, 1874, and I so find. Prior to that period all such certificates presented for conversion were converted into the eight per cent. first mortgage bonds. It did not appear that the company had ever converted any of such certificates into any other of the company's bonds except recently into five per cent. bonds."      .      .

" At intervals between the calls of the plaintiff, the company has had on hand, and used such bonds in taking up such certificates for other parties, and among others the president, said

Page, and some of the directors, had quite an amount of such certificates converted into such bonds. During such intervals, and about the summer of 1877, but exactly when did not appear, the plaintiff had $10,000 of such scrip certificates, mostly of the last number or those which did not have the convertibility clause upon their face, converted into such bonds." . . . .

" I find said Page told the plaintiff that the last two numbers, which contain no clause in regard to their convertibility, were convertible the same as those which contained such clause, and showed him the stockholders' vote of 1874. I find the company and its directors have so treated them, under the vote of the stockholders in Jan., 1874." . . . .

" The annual reports to the stockholders for the years 1871, 1872, 1873, 1874, 1875, 1876, 1877 and 1878, as published and circulated, either in pamphlet or in the Rutland Herald, were put in evidence and the statements therein contained in regard to the financial condition of the defendant were conceded to be correct. These reports generally came to the knowledge of the plaintiff, and may be referred to as a part of this report." . . . .

" At the annual meeting of the stockholders holden July 31st, 1878, a mortgage of its entire property was authorized to the New England Trust Company to secure the payment of $1,500,000 twenty year bonds or notes of the defendant, bearing five per cent. interest, $1,000,000 of which was to be used to take up the equipment bonds maturing in 1880, and the balance to fund any of the other indebtedness of the company, including the outstanding scrip dividends or certificates. Such mortgage and bonds were issued, dated August 1, 1878. The mortgage was put in evidence, and may be referred to as a part of this report. It recites the vote which authorized it. Nearly $900,000 of the seven and eight per cent. equipment bonds have been exchanged for these new five per cent. bonds, as well as quite an amount of the outstanding scrip certificates, so that only about $70,000 of such certificates are now outstanding. The company are ready to convert the plaintiff's certificates at their par value and accrued interest into these new five per cent. bonds." . . . . . . . . . . .

" The defendant claimed that it had never had income or earnings out of which a dividend could properly have been made at the time when any of said scrip certificates were issued, and for that reason said certificates were issued without authority and without consideration, and are not binding on the defendant. Whether it had income or earnings applicable to such purpose depends on the facts aforesaid. I find that the defendant has uniformly treated the scrip certificates as an obligation binding on

the defendant; and the referee is of the opinion that they are binding obligations of the defendant, but, whether due at the time this suit was commenced, or collectible in this form of action, is submitted to the court."

The other facts are stated in the opinion of the court.

*James C. Barrett* and *J. Barrett*, for the plaintiff.

The common courts are appropriate. *Reed* v. *Sturtevant*, 40 Vt. 521; *Crandall* v. *Bradley*, 7 Wend. 312; *Hennings* v. *Rothschild*, 4 Bing. 315 (13 E. C. L. 448); 2 Johns. 235; *Perry* v. *Smith*, 22 Vt. 301. Action sustainable in name of the "holder." *Hodges* v. *Shaler*, 22 N. Y. 114; *Hotchkiss* v. *Banks*, 21 Wall. 354; 1 Dan. Nego. Inst. s. 59; *Capron* v. *Capron*, 44 Vt. 410; *Hennings* v. *Rothschild*, *supra*. Consideration in the certificates sufficient. *Stevens* v. *The South Devon R. R. Co.*, 9 Hare, 313; *Browne* v. *Monmouthshire R. R. & Canal Co.*, 13 Beav. 32; *Moore* v. *Hudson R. R. R. Co.*, 12 Barb. 156, 160; 2 Redf. Railways, s. 211; *Cross* v. *Richardson*, 30 Vt. 641; *Wilson* v. *Wilson*, 32 Barb. 328. Import of the certificates. They fall within the general power of the corporation to borrow money and execute instruments in evidence thereof. Angell & Ames Corp. s. 257; Field Corp. s. 271; Jones R. R. Secu. s. 306; 1 Dan. Nego. Inst. ss. 381–6. The certificates have been ratified. Defendant estopped from denying their validity. Field Corp. s. 208, n.; *Bissell* v. *The Mich. etc. R. R. Co.*, 22 N. Y. 258; *Kent* v. *Quicksilver M. Co.*, 78 N. Y. 184–9.

A corporation after having declared a dividend and paid it to the other stockholders, cannot defend against a suit to recover the same by one stockholder, on the ground that the dividend has not been earned. *Stoddard* v. *Shetucket Co.*, 34 Conn. 542; 2 Redf. Railways, s. 240, n. The plaintiff not chargeable with knowledge. Angell & Ames Corp., p. 400; Field Corp., s. 73. The nature and rights of the "preferred or guaranteed stock" are defined by the defendant's charter. The charter is the law. As to "preferred stock" and "dividend" meaning indebtedness, payment, security, see *Burt* v. *Rattle*, 31 Ohio St. 116; *R. R. Co.* v. *Jackson*, 77 Pa. St. 321–5; 8 Mich. 100; 11 Rep. 691;

13 Ib. 475; *Bates* v. *Androscoggin R. R.*, 49 Me. 491; *R. & B. R. R. Co.* v. *Thrall*, 35 Vt. 545; *R. R. Co.* v. *Maine*, 6 Otto. 511; *Tomlinson* v. *Jessup*, 15 Wall. 459; Cooley Con. Lim. (4th Ed.) p. 340, n.; *Hyatt* v. *McMahon*, 25 Barb. 457; 13 Gray, 239; 23 Pick. 340.

*Prout & Walker*, for the defendant.

No recovery on the common counts. 2 Greenl. Ev. s. 111; Alb. Tr. Ev. 277, 457; *Royce* v. *Nye*, 52 Vt. 372; *Vaughn* v. *Rugg*, Ib. 235. Refusing to exchange the certificates did not convert the plaintiff's claim into a money obligation. *Scott* v. *Montague*, 16 Vt. 164; *Rice* v. *Adams*, 32 Vt. 691; *Hale* v. *Fish*, 48 Vt. 227. Certificates not negotiable; hence, the "holder" cannot recover under the common counts. *Wainwright* v. *Straw*, 15 Vt. 215; *Smilie* v. *Stevens*, 41 Vt. 321; Story Pro. N. ss. 17, 18; *Farquhar* v. *Ins. Co.*, 6 Rep. 676; *Bank* v. *Green*, 13 Rep. 625; *Merriwether* v. *Saline Co.*, 5 Dillon, 265; Byles' Bills, 160, 164; *R. R. Co.* v. *Howard*, 7 Wall. 396; *Way* v. *Smith*, 111 Mass. 523, 137; 11 Gray, 170. Defendant had no right to exchange its mortgage bonds for the certificates. Wade Retroactive Laws, s. 71. Plaintiff affected with notice. *Green* v. *Bank*, 1 Thompson's Bank Cas. 497; *Chaffee* v. *R. R. Co.*, 53 Vt. 352; *People* v. *Batchellor*, 22 N. Y. 128. The funds must be applied as provided for by charter. *Munt* v. *Shrewsbury R. R. Co.*, 3 Eng. L. & Eq. R. 149; *McGregor* v. *The Deal & Dover R. R. Co.*, 16 L. & Eq. 180; 21 How. 441; *Horton* v. *Thompson*, 71 N. Y. 513; 14 L. R. Eq. 322; 2 Abf. Dig. L. Corp. 77, s. 55. Preferred or guaranteed stock not entitled to dividends until all debts of defendant are paid. Field Corp. s. 121; *Lockhart* v. *Van Alstyne*, 31 Mich. 76; *Williston* v. *Mich. R. R.*, 13 Allen, 400; *Taft* v. *Hartford R. R. Co.*, 8 R. I. 310; 1 Dillon, 174; *St. John* v. *Erie R. R. Co.*, 10 Blach. 271; 4 Am. Corp. Cas. 92; *McGregor* v. *Home Ins. Co.* 6 Stewart (N. J.) 181; *Henry* v. *The Great N. R. R. Co.*, 58 Eng. Ch. R. 605; *Boardman* v. *L. S. & S. Mich. R. R. Co.*, 84 N. Y. 157; Green's Brice, 147, n.; 1 Potter L. Corp. 329; 2 Redf. Railways, 529, 240, 544; Jones' R. R. Securities, s. 623; Boone Corp. 125; Field Corp.

ss. 104, 172; 33 Conn. 457; 72 N. Y. 207. It is a breach of trust and fraud to declare a dividend where no profits have been made. 1 Redf. Railways; 153; *Burnes* v. *Pennell*, 2 H. L. Cas. 496; Bigelow Frauds, 151; *Mann* v. *Cook*, 20 Conn. 217; 2 Redf. Railways, 537; 3 Keyes, 521. The stock and property a trust fund to pay the debts. *Nat. Trust Co.* v. *Miller*, 6 Stewart (N. Y.) 163; *R. R. Co.* v. *Howard*, 7 Wall. 409; *Bartlett* v. *Drew*, 57 N. Y. 587; 3 Mason, 311; Field Corp. s. 143; *Upton* v. *Tribilcock*, 91 U. S. 47; 2 Black. 721; 1 McCrary, 86; *Richardson* v. *R. R. Co.*, 44 Vt. 622; 22 Wall. 136; 10 Blatch. 271-9; *Evans* v. *Coventry*, 8 De G. M. & G. 835. Ratification. Doing a thing prohibited not a ratification of it. Story Agency, 115; 9 Exchequer, 55; 43 N. H. 516; 7 Conn. 93; 22 Conn. 501; *Pearce* v. *M. & I. R. R. Co.*, 21 How. 442; 5 Denio. 567; 41 N. Y. 35; 3 Cow. 623; Pierce Railroads, 34; Angell & Ames Corp. 309; 1 Seld. 320. No estoppel. 2 Redf. Railways, s. 236; *Chase* v. *Vanderbilt*, 62 N. Y. 307; Bigelow Estop. 438, 515, 263; 19 Wall. 146, 160; 38 Barb. 534; 34 N. Y. 30; Herman Estop. 510; Boone Corp. 104; 9 R. I. 366; 11 Wend. 18; 8 Cow. 543; Field Corp. s. 264.

The opinion of the court was delivered by

VEAZEY, J. The Rutland & Burlington R. R. Co. had two mortgages resting upon its property, and the road was in possession of, and being operated by, the trustees of the second mortgage bondholders. The trustees of the first mortgage bondholders had brought suit to foreclose that mortgage. While this suit was pending the bondholders under the second mortgage obtained an act of incorporation under the name of the Rutland R. R. Co., for the purpose of " holding, maintaining and operating " said R. & B. Railroad, and in July of that year, 1867, the company was organized. Under the authority of the eighth and ninth sections of the charter and for the purpose therein named; and under the circumstances detailed in the referee's report, the defendant by corporate vote, issued prior to February, 1872, " preferred or guaranteed stock, commonly called preferred guaranteed stock," to the amount of $4,300,000. The company had also issued com-

mon stock to the amount of $2,500,000. February 1, 1872, the company made its first issue of certificates of " scrip dividend," specified therein as being " in settlement of dividends on the preferred guaranteed stock." Thereafter from time to time the company continued to issue similar certificates, but varying somewhat in their terms. The plaintiff having become the owner and holder of such certificates of different issues to an amount of over $21,000, and having demanded an exchange into the bonds of the company referred to in the certificates, and the company having refused to make the exchange, and then having demanded payment and been refused, brought this suit declaring in the common counts in assumpsit, to recover the amount of his certificates.

The plaintiff was a preferred stockholder from June 4, 1872, to October 9, 1877, and during this time purchased the certificates in suit and others, and had issued to him certificates on his own stock. The referee gives a statement of the floating debt of the defendant at yearly and half yearly intervals, beginning August 1st, 1868, and ending August 1st, 1879, and says these were the balances of the bills payable as shown by the treasurer's books at the several dates named, which both parties treated as a fair representation of the floating debt of the defendant.

The referee finds that if the floating debt and current expenses were to be first paid out of rent or income, the defendant has had no funds with which to pay the plaintiff's certificates, and had none at the time the demands were made and this suit brought. If the preferred stock was entitled to be paid dividends before the floating debt was paid, the income of the company at the time of the demands had been sufficient to pay all such certificates issued by the defendant. The road was leased before the certificates were issued and its sole income was from rents.

The defendant claimed before the referee and now insists that it never had income or earnings out of which a dividend could properly be made at the time when any of the scrip certificates were issued, and that the certificates were issued without authority and without consideration and are not binding on the defendant.

I. A primary question on the facts reported is: Which has the

first right to the income, the creditors of the defendant company, or the preferred stockholders? The provision of the charter, section 8, is, that the preferred or guaranteed stock shall be entitled to dividends from the earnings or income of the corporation before any other dividend shall be paid.

The construction of similar provisions has not unfrequently been involved in causes in this country and in England, and the struggle has been to gain for the preferred guaranteed stockholders the double advantage of a shareholder and creditor, but without success. The legislation in this State and elsewhere has been in accord with the idea developed in the reported cases, that the stock and property of a corporation is a trust fund pledged for the payment of its debts, and the creditors' right to payment and their lien is prior to the right of every stockholder. In the late case of *National Bank* v. *Douglass*, McCrary's Rep. vol. 1, p. 86, the court say "sacredly pledged," and quoting the language of Judge CLIFFORD in *R. R. Co.* v. *Howard*, 7 Wall. 392, adds that "stockholders are not entitled to any share of the capital stock nor any dividend of the profits until all the debts of the corporation are paid." To similar purport and equally strong is the language of Judge STORY in *Wood* v. *Dummer*, 3 Mason, 308; and again in *Mumma* v. *Potomac Co.*, 8 Pet. 286, and of Judge CURTIS in *Curran* v. *The State of Arkansas and Others*, 15 How. 304. See also the numerous cases in defendant's brief on this point.

It is now well established that dividends on preferred stock are payable only out of net earnings which are applicable to the payment of dividends; Pierce on Railroads, p. 125, and cases cited in notes; and that such dividends are not payable absolutely and unconditionally as interest is, but only out of profits made by the company. The preference is limited to profits whenever earned. Jones on Railroad Securities, s. 620, and cases cited in notes; Field on Corporation, s. 121, and cases cited; *Corry* v. *Railroad Co.*, 29 Bevan, 263; *McGregor* v. *Ins. Co.*, 6 Stewart's Eq. Rep. (N. J.) 181; *St. John* v. *Erie R. R. Co.*, 10 Blatch. 271; s. c. 22 Wall, 136; *Lockhart* v. *Van Alstyne*, 31 Mich. 76; *Taft* v. *R. R. Co.*, 8 R. I. 310.

Under the provision of this charter it is not a debt that is guaranteed, but the right to a dividend from the earnings and income of the corporation. The *right* to a dividend is not a debt. There is no debt until the dividend is declared. The obligation and right to declare it does not arise until there is a fund from which it can properly be made. See cases *supra;* also *In re London India Rubber Co.*, Law Rep. 5 Eq. Cases, 525.

In this case it could only be made from " earnings and income." The only earnings and income was the rental which was insufficient to pay the operating expenses and the floating debt. Upon the plaintiff's theory there was an unqualified obligation to declare and pay dividends to preferred stockholders from the earnings and income, notwithstanding there were debts of the company greater than the earnings and income. The creditor must come after the stockholder. Under this claim the rule universally recognized in the books that the property of a corporation is a trust fund pledged for the payment of the debts of the corporation, and the distinction everywhere upheld between a stockholder and creditors, would have to be disregarded. In our view the terms of the charter neither force nor import such construction.

II. But the learned counsel for the plaintiff deny that the preferred stock was *capital* stock, and insist that the only capital stock of the defendant company is the common stock, or the stock that was issued to the second mortgage bondholders, and that the intent and meaning of the charter in reference to the issue of preferred stock, was to provide means of exchanging the first mortgage bonds into a preferred stock, but not to affect the security, and that such was the understanding of all parties at the time, and that wherever preferred stockholders have been held to be *stockholders* in distinction from *creditors*, it has been upon the ground that by the terms of the act or contract their stock formed a part of the *capital* stock, and that they by taking the same become in reality and in substance, as well as in name, stockholders, holders of shares of *capital* stock.

It is true the charter was granted to the second bondholders, and provides that the capital stock, meaning undoubtedly the stock

to be obtained by the second mortgage bonds, should be 3,000,000 dollars, and in the provision, section 8, for issuing the preferred or guaranteed stock, it is not called capital stock. But the counsel nowhere intimate in their able brief wherein the preferred stock lacked any element or quality of the common stock. It seems to have had every privilege and recognition of the common stock in the meetings and administration of the company. The referee puts it in this way: " Besides the preferred stock the company had issued about $2,500,000 of common stock, the holders of which were entitled to and did vote in the stockholders' meetings, having equal power in shaping and controlling the action of the company, with the holders of preferred stock to the same amount." The preferred stockholders had not only every privilege but were exempt from none of the liabilities of the common stockholders. If the eighth section of the charter had said preferred capital stock instead of preferred stock, what different quality would that have given the stock? The charter specifies the amount of the capital stock of the company, which was sufficient to cover the second mortgage bonds, but much less than the value of the road, the charter being granted to those bondholders, and it then provides for the issue of preferred stock, and limits that to the amount of prior claims or incumbrances.

The terms of this charter are plain to the intent of providing for two kinds of stock, viz.: common stock and preferred or guaranteed stock. It makes no distinction between them except to the effect that the preferred stock should receive dividends from the earnings and income of the corporation, at a rate and time named, with interest thereafter if not paid, " *before any other dividend shall be made therefrom.*" What is there in the charter to indicate that the legislature intended to simply create a creditor class in creating preferred stockholders, and meant *interest* by the word dividend? As stated by Jones on Railroad Secu. s. 619, " whatever rights attached to it [preferred stock] when issued continue to adhere to it." The peculiar right specified in the charter to be attached to it, is the right to a dividend before any should be made upon the common stock, and that it may be converted into common stock. In *St. John* v. *Erie R. R. Co.*,

*supra*, Judge BLATCHFORD based his result upon a " fair and reasonable construction of the contract." Judge SWAYNE, in the same case in the Supreme Court, says : " The question presented in the present case depends for its solution *wholly* upon the construction given to the fifth clause of the agreement." The defendant's charter is the instrument to be construed here, and to borrow the words of Judge SWAYNE, " The language employed is apt to express the relation of stockholders. None to express the relation of creditors is found in the instrument." Under it " the preferred stockholders are entitled to have the full amount of their dividends paid before any payment is made in respect of dividends upon the ordinary stock." Jones, s. 620, and cases cited. In *Taft* v. *H. P. & F. R. R. Co.*, 8 R. I. 310, it was held that the word " guaranteed " in connection with preferred stock, did not change the legal effect of the rights of holders of such stock. BRADLEY, C. J., after referring to the English cases, says : " Without dwelling longer upon these and similar authorities, it is perfectly apparent that the guaranty of dividends by a railway company is considered by the courts and by the business community also, to mean nothing more than a pledge of the funds legally applicable to the purposes of a dividend ; that, in short, it is a dividend and not a debt."

No claim is made in this case that the preferred shareholder does not have all the rights as a shareholder that is enjoyed by the holder of the common stock. The claim is that he is also a creditor with all the rights pertaining to that relation. Against this claim are the terms of the charter, the presumptions of law and the usual course of business. The evidence of his relation to the company is a certificate of stock which under the charter should, and probably does, guarantee a dividend to be paid to him before any dividend shall be paid on the common stock. Mr. Pierce, page 120, defines dividends to be corporate funds derived from the earnings of the corporation, and appropriated by a corporate act to be divided among the stockholders. A preferred dividend is the fund paid to one class of shareholders in priority to that to be paid to another class. See authorities cited by Pierce.

9

The case most relied upon by the plaintiff's counsel, where it was held that a holder of stock was a creditor, is that of *Burt* v. *Rattle*, reported in The Reporter, March 6, 1878, p. 310, (31 Ohio St. 116). The preferred stock in that case was issued under a statute that provided that the " holders of such preferred stock shall not have the right to vote on any question, at any meeting of the stockholders of such corporation, or for the election of officers, and shall not be liable for the debts of such corporation." And the corporation pursuant to a vote of the corporation secured the preferred stock then in suit by a bond and mortgage of the corporate property. WELCH, C. J., in delivering the opinion of the court says : " A majority of us think that the transaction between the corporation and the so-called preferred stockholders, was in fact and in law a loaning of money upon mortgage security and not the creation of additional members of the corporation. A man who advances his money to a corporation, and takes a bond and mortgage for its repayment, and also by express agreement between the parties takes no interest or risks in the concerns of the company, is a creditor of the company, and to call him a stockholder is a simple misnomer."

The distinction between that case and the one at bar is apparent. It is insisted that the provisions of the defendant's charter to the effect that the preferred stock should be issued only for the " purpose of satisfying, paying or purchasing prior claims, or incumbrances upon or interests in said road and property," and should be limited to the amount of such claims, and providing the rate of dividend, and for its payment semi-annually, and, " until declared," interest thereon to be added from the end of the half year when the same should be declared, and that no mortgage should take precedence of the preferred stock in the application of income, all show a purpose to create a preferred stock with all the security of a first mortgage, taken in connection with the fact that the prior claims consisted largely of the first mortgage then in process of foreclosure.

Courts have not favored the creation of different classes of shareholders with superior rights in one over others. Doubt is expressed in the books whether there is power in a corporation

to distinguish between its stockholders by making them unequal in interest and right, except as it is expressly granted. Although some courts and law writers have said that the issue of preferred stock is but a method of borrowing money, and that preferred stock is only a form of mortgage, we think the law as now settled is better expressed by Pierce, who says, page 124 : " The issue of preferred stock is a mode by which a corporation obtains funds for its enterprise, *without borrowing money or contracting a debt.*" The other view has been expressed generally in cases where the claim was that no dividend could properly be paid on preferred stock before and without paying on the other stock, as in *R. & B. R. R. Co.* v. *Thrall*, 35 Vt. 536 ; or where the preferred stockholders had no right in the management of the company, and were not liable for debts, and were nominal stockholders only, as in *Burt* v. *Rattle, supra.*

It was necessary for the defendant, consisting of the second mortgage bondholders, to raise money to pay up the first mortgage, in order to save the property from going on that mortgage. Two ways were open to them, one to borrow money, the other to sell stock. They decided to try the latter method. The pressure was severe upon them, and the amount to be raised was large. The stock in order to be sold must necessarily be carefully guarded. The issue of the preferred stock in this case was made as it usually is, that is, when the corporation has reached a crisis in its affairs, and the corporators are unwilling or unable to put more or sufficient money into the business, but are nevertheless disposed to give to those who will do so a preference in profits. Careful guards are, therefore, usually thrown around preferred stock in the charter or contract, as was done in this case ; but this did not change the character of the transaction. It was still an obtaining of funds by sale of stock, and not a borrowing of money on a mortgage.

These provisions of the charter seem to us to point to a careful security of the benefit of the preference as between the two kinds of stock, but not a preference over the creditors of the corporation ; not a preference with a perpetual promise to pay more than a legal rate of interest on the sum invested, out of the earnings,

without regard to what the corporation owes as a " floating debt," not a preference that would give to the holders of the preferred stock the character of corporators with the right to be the corporate managers, and also make them the preferred creditors of the corporation ; not a preference under which the debts of the corporation might, and, as the company was situated, must go on increasing from year to year indefinitely unprovided for, while the stockholders and managers were receiving the whole income in dividends.   We think the language of the charter well expresses what the report shows was the only object' which the parties in interest needed or wanted to secure, so far as they then understood the situation, viz. :  a preference in dividend between the two kinds of stock and nothing more.   Under their preference the common stock can receive nothing until all the dividends on the preferred stock are paid according to the terms of the charter. Pierce on Railroads, page 125, and cases cited in notes.

It follows from this construction of the charter that the earnings of the defendant corporation should have. been appropriated to the payment of its floating debt, in preference to the payment of dividends on preferred stock.

III.   It appears from the report that until early in the year 1872, the financial condition  of the company had not been fully understood, and that a very large floating indebtedness then first came to light.   In this emergency the company began the issue of scrip dividend certificates.   The first certificates were dated February 1st, 1872, and they were issued every six months thereafter until February 1st, 1875.

The plaintiff claims that even if the company had no profits out of which to pay dividends, and therefore ought not to have made or paid them, yet it is estopped from denying the validity of these certificates as obligations of the company by reason of its conduct in regard to them.

The defendant claims that they are incapable of ratification ; that they are absolutely void because issued without right ;  that being issued when the company had no money applicable to dividends it was an unauthorized, illegal act, which affected the cer-

tificates the same as though prohibited in the charter.

There was no lack of authority to make dividends to preferred stockholders. The charter provided for it. The company's action in regard to dividends was unseasonable, that is before it had funds applicable. Did such unseasonable exercise of power render the certificates void? The question is not what might have been the right of creditor or stockholders had they interposed. But *must* the court say in behalf of the *company only*, that its premature exercise of charter power was void because premature? We think not. In *Stoddard* v. *Shetucket Foundry Co.*, 34 Conn. 542, it was held in an action against the corporation by a stockholder, to recover a dividend declared by the directors, if all the other stockholders have received and retain their dividends, the corporation cannot set up in defence, that the dividend has not been earned, and that its payment would withdraw a part of the capital. *Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 186. " If the power to make the contract exists, an excess in some particulars is not a defence." Pierce, 518, and cases there cited. In *Taylor* v. *Chichester & M. R. Co.*, L. R. 2 Exch. 356, 378, BLACKBURN, J., says: " I think it very unfortunate that the same phrase of *Ultra Vires* has been used to express both an excess of authority as against the shareholders, and the doing of an act illegal as being *malum prohibitum;* for the two things are substantially different; and I think the use of the same phrase for both has produced confusion."

It is ordinarily a matter of internal management, to be determined by the company·or the directors, when to declare dividends and the amount. This is subject to limitations, and equity will interfere either to enforce or restrain a dividend upon sufficient showing. Green's Brice, *Ultra Vires*, 2 Am. Ed. p. 202, and cases cited.

But equity even would not interfere with a dividend unless it appeared that somebody in particular was hurt or liable to be injured. It would not interfere after all danger had passed, and for the sake of vindicating general principles. *Stevens* v. *The South Devon R'y Co.*, 9 Hare, 313; reported also in XII. L. and Eq. 229; *Browne* v. *The Monmouthshire R'y & Canal Co.*, 13 Beav.

32 ; reported also in IV Eng. L. and Eq. 113 ; *Moore* v. *Hudson R. R. R. Co.*, 12 Barb. 156, 160 ; 2 Redf. on Railways, s. 211.

IV. These certificates being susceptible of ratification, should the defendant be estopped from denying their validity in this case ? All these issues of certificates were authorized by nearly if not entirely unanimous votes of the corporation, followed by votes of the directors. The first vote was as follows :

" *Resolved*, That the directors be authorized and are hereby instructed to prepare and issue to the holders of the preferred stock, a scrip dividend of three and a half per cent., to date February 1st, 1872, upon forty three thousand shares of preferred stock." The next vote was, " to pay further dividends on the preferred stock of the company by issuing to the holders thereof scrip (dividends) therefor as the same may become due." Other votes followed from time to time. Every vote of the company and directors expressed or implied the idea of a payment of dividends. These certificates were all expressed to be " in settlement of dividends on the preferred guaranteed stock " ; and were made convertible on demand or at the option of the holders, into mortgage bonds of the company, except the last two issues. The referee finds that the plaintiff received scrip certificates as they were issued from time to time on the preferred stock owned by him, and they have all been converted into bonds. Certificates have been so converted amounting to over $1,000,000. In such conversions, no distinction or difference has been made between the two last issues, Nos. 6 and 7, and the earlier issues. Considerable of this scrip was sold in market and was purchased by the president, treasurer and some of the directors, and was converted into bonds. The scrip so purchased in market was converted by the company into bonds, for the purchaser as readily as it was for the holders of the preferred stock to whom the scrip certificates thereon were issued. This was done for the plaintiff to quite an extent down to about the time this suit was brought, July, 1878. The referee reports that the president had the general direction of the conversion of scrip certificates into bonds.

The president told the plaintiff that the last two issues, which contain no clause in regard to their convertibility, were converti· ble the same as those which contained such clause, and showed him the stockholders' vote to that effect. The referee finds the company and its directors so treated them, under that vote.

Some of the preferred stockholders, when they saw such clause was omitted from the scrip certificates, supposed they were not convertible into bonds and so sold them in market, and the plaintiff bought them at large discount, after he had been informed by the president that they were convertible into bonds, and was shown by him the said stockholders' vote to that effect; and he never knew until after this suit was brought, why the last two issues did not contain the convertible clause. Until after this suit was brought, neither the company nor any of its officers ever denied that these certificates were convertible into bonds, and the president and treasurer continued to make the conversions until after this suit was brought, though some of the later conversions were into a lower rate of interest bond, as shown in the report.

The referee does not find in terms that the plaintiff's certificates are the only ones not so converted; but he finds certificates have been so converted to an amount of over $1,000,000; and it appears by computation that the total amount of certificates was about $1,053,500. Therefore the fair conclusion from the report is that the plaintiff's certificates are substantially the only ones not converted.

It further appears that the floating debt of the company at the time this suit was brought had been very largely reduced, and it does not appear that the same treatment of these certificates with the other would have embarrassed the company, or that any creditor objected to the conversion.

The above is but a summary of what the report more fully shows that the company did in respect to the dividend certificates, and after stating the facts, the referee finds "that the defendant has uniformly treated the scrip certificates as an obligation binding on the defendant."

On the other hand the plaintiff was a stockholder, and so far as affected by constructive notice is entitled to stand no better as to

the certificates purchased by him than he would be as to certifi-
cates issued to him on his own stock. As a stockholder he can-
not escape the responsibility pertaining to that relation for the
·wrongful policy of the company as to dividends. But it was only
the financial condition of the company that rendered the policy
wrongful. Can it be said that a stockholder is necessarily
chargeable with notice that the affairs of a corporation are in such
condition that they ought not to make a dividend ? The propriety
of making a dividend at a particular time is a matter to be de-
termined upon consideration of all the circumstances ; and these
are not usually known by the stockholders. If a dividend is voted
unwisely and without strict right at the time on account of no funds,
the law would afford a remedy in behalf of an injured party. But
may the *company itself*, after having so voted and paid every
stockholder except the plaintiff, no one ever objecting, and after
having treated the transaction as valid throughout, and after all
danger from the wrongful policy has passed, say to the last bene-
ficiary of the dividend, the act of voting and paying these divi-
dends in scrip form was unlawful, and you, being a stockholder,
thereby participated, and are, therefore, not entitled to the benefit
that every other stockholder has enjoyed ? It does not appear
that the plaintiff had knowledge, or suspicion in fact, that the com-
pany, its officers, or its stockholders, designed or transacted any-
thing unlawful or wrong towards any parties or interests in voting
to pay dividends in scrip, or in paying the scrip by exchange into
bonds, as was done down to the time payment was refused to him-
self. He had no part, in fact, in what was done by the company.
The company decided the question of dividends for itself. It, and
all its agents, officers and stockholders, have concurred in all that
has been voted and transacted, and have taken the fruits thereof
to themselves as matter of lawful right, and by no vote or act have
any of said parties denied the validity and good faith of what has
been done, until the defence in this suit was asserted.

After this suit was brought the stockholders voted to issue five
per cent. bonds, secured by mortgage, " to fund the indebtedness
of the company, including the outstanding scrip dividends or cer-
tificates," and used them for that purpose. The company has

more than a million dollars bonded debt created by taking up these certificates, and has devoted its earnings and income to pay the interest on it ; and the preferred stockholders have received this benefit.   The effect of excluding the plaintiff as to his certificates would be to divide the amount among the preferred stockholders who have already enjoyed the benefit he now claims. We think, upon the facts stated in the report, the company cannot in this suit assert as a defense its wrongful administration. The plaintiff stands in no such equal fault as to warrant a denial of remedy.   *Harrington* v. *Grant*, 54 Vt. 236, and cases there cited.

V.   The defense of alleged want of consideration in the certificates is not available.

The right to dividends, seven per cent., existed under the charter when there should be funds applicable.   As before shown, this is a continuing right.   The company issued the certificates in settlement.   The shareholder took them in settlement.   The votes were in effect to pay the dividends in this form.   The certificates were taken, and the right to a dividend in any other form surrendered.   They were taken in settlement of a claim made by the shareholders, and recognized as valid by the company, and authorized by the terms of the charter.   There would be no question but that this would constitute a good consideration if the financial condition of the company had warranted a dividend. *Hayward* v. *Pilgrim Soc.*, 21 Pick. 276 ; *Blake* v. *Peck*, 11 Vt. 483 ; *Cross* v. *Richardson*, 30 Vt. 641 ; *Miller* v. *Emans*, 19 N. Y. 384 ; *Plank Road Co.* v. *Payne*, 17 Barb. 567.

The company having obtained the surrender in the exercise of a power existing under the charter, and having always treated the certificates as resting upon the same consideration as though given in surrender of a dividend actually earned and warranted, cannot, under the facts disclosed, be heard to say that the certificate holders surrendered nothing.

VI.   The defendant's counsel make the point and support it by strong argument and great array of authority, that the company

had no right to exchange its mortgage bonds for these dividend certificates ; that the bonds were authorized and issued for a particular purpose,—a purpose or object expressed in the statute, in the acts in amendment of the defendant's charter, in the resolution of the corporation, and in the eight per cent. mortgage itself.

It is plain that the company had no better right to appropriate its bonds to the payment of a dividend not strictly earned than it had to pay in money. There was no absolute right to a dividend in any form before debts were paid. Neither is it clear that the amended charter and the mortgage issued thereunder should be construed as authorizing the exchange of the bonds for these certificates. We make no further expression upon these points, because what has been said upon the subject of ratification and estoppel applies as well here. The stockholders themselves in corporate action have given construction to the act and the mortgage, until they have been benefitted under that construction to the amount of a million dollars and more. It is now too late, under the facts reported, for the company to ask for a different, though perhaps better construction, as against the last holder of its obligations of this character.

VII. These certificates, except the first issues, were made payable at the option of the company, but convertible into bonds at the option of the holder. They were all issued from 1872 to 1875 inclusive, and demand made for bonds and suit brought in 1878. As to certificates promising to pay a specified sum with interest, in bonds, on demand, Jones (R. R. Securities, s. 19) says: " if the corporation does not on demand exercise its election to make payment in bonds, the creditor may recover the amount in money ; payment in bonds being a privilege for the benefit of the corporation ; but if this privilege be not taken advantage of at the proper time, the rule of damages is the principal sum and interest." These certificates are different, but whatever would be the proper construction of them independently, we think the facts of this case bring them within the rule established as to certificates payable in bonds on demand, and this applies to the first issue.

The declaration was in general assumpsit, but the stipulation provides that special counts may be filed. Formerly, espocially in England, whenever there was an express or special promise, all implied assumpsits were merged and superseded, and could never after be resorted to. But this rule has been deviated from, especially in this State. If goods have been sold, work done or money passed, whatever may have been the agreement as to price, or mode, or time of payment, if the terms have transpired so that money has become due, the general count is sufficient. But when the contract is executory and subsisting, and the action is for the breach, for the recovery of damages, then the declaration must be special. *Way* v. *Wakefield*, 7 Vt. 223. It is settled law in this State that the general counts are sufficient for the recovery on a promissory note payable in specified articles, when payment is not made at the time named. Upon failure to pay as agreed, the note is considered as an obligation for the payment of money alone. *Perry* v. *Smith*, 22 Vt. 301. This rule was applied in a case of general assumpsit, where the stipulation was to accept a portion of the price of the work in the stock of the defendant company, which was worth only 33 per cent. at the time the work was finished. The court say : " The stock of a corporation is but a certificate of such a sum being due the bearer. And where the party stipulates to pay in his own paper, if he refuse, suit may be brought immediately, although the paper was to have been on time, if given. But it was never supposed the party could reduce the money by showing his paper depreciated in the market. This would be virtually giving the difference to the other stockholders. *Barker et al.* v. *T. & H. R. R. Co.*, 27 Vt. 766 ; see also *Wainwright* v. *Straw*, 15 Vt. 219 ; *Read* v. *Sturtevant*, 40 Vt. 521 ; *Bradley* v. *Phillips*, 52 Vt. 517. Under the decisions in this State we hold the common counts were sufficient.

VIII. It is claimed these certificates are not negotiable instruments, hence the plaintiff cannot recover in his own name. They run to the " holder," went on the market, and have always been treated by the defendant as entitling the subsequent holder to the same rights as though payable to bearer. Such has always

been the treatment accorded the plaintiff. The remarks of the court in *Hennings* v. *Rothschild*, 4 Bing. 315 (13 En. Com. L., 448), are pertinent : " We do not say whether the receipts were transferable or not. The ground upon which we put the plaintiff's right to recover in this case, is this, that whether the original receipts were transferrable or not, the defendant has treated the plaintiff as the person holding these receipts, and has undertaken to consider him as the person who originally subscribed the money." So in this case, as these certificates are worded and have been treated, we do not think the plaintiff's right of recovery depends on their negotiability, but, whether strictly negotiable or not, which has not been considered, we think he may stand on them as though he were the original holder. The plaintiff holds by purchase and payment, in his own right, without wrong to the company, the obligation of the company directly to himself as holder. The terms of the paper imply that it was to be used, recognized and treated, as it has been by the company and third parties, and it should now receive the same recognition by the court. Upon the facts found there would be strong ground for putting the case, if necessary, upon the principle stated in *Moar* v. *Wright*, 1 Vt. 57 ; *Bucklin* v. *Ward*, 7 Vt. 195 ; and *Hodges* v. *Eastman*, 12 Vt. 358 ; in all of which it was held that if the maker of a note expressly promises to pay his note to the holder, the holder might sue on such promise in his own name, though he could not sue on the note by reason of its not being negotiable, or not being legally transferred to him.

IX.    The Cheshire Railroad Company, one of the trustees named in writ, is a foreign corporation. The defendant claims it cannot be held chargeable, *first*, because the process does not allege that this corporation is operating any railroad or doing any business in this State, or was under any liability in consequence of any debt due or owing in this State, and insists that such jurisdictional fact is necessary to be alleged in the process. The process alleges that the Cheshire Company " has an authorized agent resident within the State of Vermont at Bellows Falls, in the town of Rockingham and the County of Windham and said State of

Vermont." Such allegation is sufficient to give the court juris-diction when service has been made according to the statute. The question whether chargeable follows on disclosure or default. The disclosure filed would make the Cheshire Company charge-able. The defendant filed allegations, charging that the fund to be paid monthly by that company to the defendant had been as-signed by the defendant for valuable consideration to one Wil-liams, and that the Cheshire Company had promised to pay it to him. The difficulty with this defence is, that it stands on mere allegation without any proof. Neither does the referee's report, which was agreed to be treated as a commissioner's report in the trustee branch of the case, contain any finding upon this allega-tion. The liability is left to stand upon the disclosure and the report, and, so far as these show, both trustees are chargeable.

The defendant filed allegations, claiming for reasons therein stated that the Central Vermont Railroad Company should not be held or adjudged chargeable as trustee. The reasons assigned pertain *not* to any question between the trustee and the defendant (except the assignment to Williams), but to the right of the plain-tiff to recover of the defendant. The statute, Gen. Sts., c. 34, s. 16, R. L., s. 1094, provides that either party may allege and prove any facts that may be material in deciding whether the al-leged trustee is chargeable. This does not refer to the issues be-tween the principal parties, but to questions as to the liability of the alleged trustee. There being no such question in this case, as it stands on the disclosure and report, said allegations should be dismissed.

The *pro forma* judgment of the County Court is reversed, and judgment for the plaintiff to recover the amount of his scrip divi-dend certificates with interest as found by the referee, with inter-est thereon, and both the Central Vermont Railroad Company and the Cheshire Railroad Company are adjudged chargeable as trustees.