No. 19,140.

LYDIA E. INSCHO et al., *Appellees*, v. THE MID-CONTI-NENT DEVELOPMENT COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. CORPORATIONS—*Development of Gas and Oil—In Whom Rest Control and Management of Corporation—Action by Pre-ferred Stockholder for Dividends—Proper Grounds for Ap-pointment of Receiver Stated.* The majority of the stockhold-ers of a corporation have the right to control the corporation, and the majority of the board of directors have the right to determine its policies and manage and direct its affairs so long as they act in good faith and within the limitations of the law. The appointment of a receiver for a solvent, going concern is a last-resort remedy and should not be employed to correct improper conduct when other adequate remedy is available. Bad judgment and ill success in previous ventures, completed or not being actively prosecuted, current transactions merely unwise and not so reckless or extravagant as to amount to breach of trust, irregularities and misconduct which are not so culpable as to jeopardize the interests of the corporation and the rights of stockholders, and dissensions among direc-tors, so long as a majority of them control, do not warrant the appointment of a receiver. In no case should a court take the property and business of a solvent, going corporation out of the hands of the board of directors and into its own hands by the appointment of a receiver at the suit of a minority stockholder unless the right of the plaintiff be free from reasonable doubt and the danger of loss or injury be clearly proved.

2. SAME—*Findings of Facts—Disclose no Ground for Appoint-ment of Receiver—Abuse of Judicial Discretion.* This suit was commenced by a preferred stockholder for a dividend, for the appropriation of the property of the corporation to the payment of such dividend, for the redemption of her stock, and for the appointment of a receiver to accomplish the pur-poses of the suit. A receiver was appointed at the commence-ment of the suit on the allegations of the verified petition, which contained numerous specifications of misconduct on the part of the board of directors, and charged imminence of in-solvency. A referee was appointed to hear the cause, who returned findings of fact and conclusions of law which the court adopted, except a recommendation that the receiver be

discharged. Before the reference was made a new and enlarged board of directors was chosen at a regular stockholders' meeting, which new board the referee found to be harmonious, and against which no objection of any kind was lodged. The charge of threatened insolvency was not sustained. *Held*, the retention of the receiver after the election of the new board of directors constituted an abuse of judicial discretion. *Held*, further, the findings of fact disclose that the original appointment of the receiver was not justified.

3. SAME—*Preferred Stock—Not a Certificate of Indebtedness —Holder of Preferred Stock a Stockholder in Corporation.* The capital stock of the corporation consisted of $100,000 common stock and $50,000 preferred stock. The plaintiff purchased 500 shares of the preferred stock and received a certificate of stock which provided there should be paid on it from net earnings a fixed yearly dividend from date of issuance at the rate of 7 per cent per annum, to be earned before dividends on common stock were declared; that the stock should not be entitled to further dividends and should have no voting power; that it should be preferred as to assets on winding up the affairs of the company; and that it should be redeemable at the option of the company after one year from date of issue, at par with accrued dividends. *Held*, the certificate was a certificate of stock and not a certificate of indebtedness, and the plaintiff was a stockholder of the corporation and not a creditor.

4. SAME—*Resolutions of Board of Directors to Redeem Preferred Stock—Dividends Payable Only from Net Earnings.* The board of directors adopted a resolution to redeem the preferred stock, and at the same time adopted a resolution to set aside 75 per cent of the gross earnings from that time on for that purpose, to be known as a preferred stock fund, to be apportioned as often as 25 per cent of the amount of the preferred stock was accumulated. The resolutions were adopted only eight days before the receiver was appointed, and the board of directors had no opportunity to carry them out. *Held*, the resolutions must be construed together, and so considered they merely pledged the transfer of 75 per cent of future gross earnings to the preferred stock fund, to be apportioned as stated; the entire issue of preferred stock did not immediately become an absolute liability of the company; the preferred stockholders continued to be stockholders and not creditors until an apportionment of the preferred stock fund was made; and the preferred stockholders then became creditors only with respect to such apportionment.

Inscho v. Development Co.

5. SAME—*Findings—Disclose No Net Earnings from, Which to Pay Dividends on Preferred Stock.* The defendant engaged in the business of prospecting for and producing gas and oil. It developed a valuable gas field near Muncie, left it for other fields, and then returned to it after the proceeds of the sale of its stock had been spent. It then borrowed $11,000, which it used to build a pipe line to supply gas to consumers with whom it had contracts. By bringing in new wells and connecting them with the pipe line it brought its income up to an average of $2800 per month, and received for the sale of gas for the thirty days next preceding the appointment of the receiver the sum of $3000. It expended all earnings received after the pipe line was built in repaying the money borrowed to build the pipe line, in drilling new wells and connecting them with the pipe line, and for general expenses. When the suit was commenced it still owed about $2500 of indebtedness incurred for these purposes, which was due and payable. *Held,* there were no net earnings out of which to pay dividends on the preferred stock.

6. SAME—*Claims of Creditors Superior to Claims of Preferred Stockholders.* At the time the resolutions referred to were adopted the board of directors adopted a resolution authorizing the secretary and treasurer to proceed with the payment of preferred dividends. At that time there were about $2900 in the treasury which were forthwith applied to the satisfaction of the claims of creditors. *Held,* the money was not net earnings, and the duty to pay creditors was superior to the duty to pay preferred stockholders.

Appeal from Wyandotte district court, division No. 1; EDWARD L. FISCHER, judge. Opinion filed March 6, 1915. Reversed.

*C. Angevine, J. K. Cubbison,* and *William G. Holt,* all of Kansas City, for the appellant.

*T. F. Railsback,* of Kansas City, for the appellees.

The opinion of the court was delivered by

BURCH, J.: On August 15, 1911, the plaintiff, Lydia E. Inscho, the owner of five hundred shares of preferred stock issued by the defendant, sued the defendant to recover the sum of $35 as a seven per cent dividend on her stock for the preceding year. On the same

day the judge of the district court on presentation to him of the verified petition, appointed a receiver for the defendant. On the same day the receiver qualified and took possession of all the defendant's property. On the same day an intervening stockholder filed a pleading praying judgment for a $7 dividend. Later two other stockholders intervened, asking for dividends in sums of $35 and $70, respectively. Issues were made up, and in March, 1912, a referee was appointed to hear the case. In October, 1912, the referee reported findings of fact and conclusions of law and recommended the discharge of the receiver. Various motions relating to the referee's report were filed, including a motion by the defendant to discharge the receiver and a motion for judgment in favor of the defendant on the referee's findings of fact. On November 29, 1912, the cause was finally submitted to the district court. The cause was held under advisement until June 7, 1913, when the referee's report was adopted, except the recommendation to discharge the receiver, the referee's findings were stated as findings of the court, and judgment was rendered in favor of the plaintiff, the interveners, and all other holders of preferred stock, for dividends, for the redemption of their stock, and for other relief. The defendant appeals.

The defendant was organized under the laws of the state of Arizona with a capital stock of $100,000 common stock and $50,000 preferred stock. It engaged in the business of prospecting for and producing gas and oil. It first drilled for gas and oil in Chase and Morris counties, and spent a large sum of money in such work without return. It then developed a good gas field near Muncie, in Wyandotte county. It then explored a field in Marshall county, Oklahoma, and purchased a majority of the stock of an Oklahoma corporation known as the Mal-Millan Company, organized for the production of gas and oil and occupying the Marshall county field. Large sums of money were spent in these ven-

tures without success. It then returned to the Muncie field and was operating there when the action was commenced.

The petition disclosed that the plaintiff purchased her stock on July 5, 1910. It was alleged that the net earnings of the defendant, from which 7 per cent annual dividends on preferred stock were payable, were and had been for some months about $3000 per month; that such earnings were sufficient to enable the defendant to pay one annual dividend to the plaintiff in the sum of $35, but that such dividend had not been paid, and the plaintiff desired to subject the property of the defendant to payment of her claim. The petition further alleged that at a recent meeting of the board of directors a reserved privilege to redeem the preferred stock at par with accumulated dividends had been exercised, a resolution had been adopted to create a sinking fund for the redemption of the preferred stock, and the preferred stockholders had been notified of the action taken. A copy of the plaintiff's certificate of stock was attached to the petition, the material portions of which read as follows:

"This certifies that Mrs. Lydia E. Inscho is the owner of 500 Shares of the Preferred Capital Stock of the Mid-continent Development Company, full paid and nonassessable, on which there shall be paid by said Company from its net earnings a fixed yearly dividend from date of issuance, at the rate of seven per cent per annum, payable semi-annually, which shall be earned before dividends are declared from time to time on the Common Stock. This Stock is also Preferred as to the assets of the Corporation in case of winding up its affairs, and shall not be entitled to any further dividends nor have any voting power. The stock is redeemable at the option of the Company after one year from date of issuance by paying par value thereof, with accrued dividends."

The remainder of the petition was quite prolix and redundant, but may be summarized as containing the following charges against the defendant. Nothing had

been paid for the common stock. . Subscriptions to the entire amount of the preferred stock had been paid into the company's treasury. The common stock controlled the corporation, and the money supplied by the preferred stock had been wasted through fraudulent conduct, illegal investments, and culpable mismanagement. Fraudulent, illegal and wasteful transactions were in contemplation. Members of the board of directors were financially interested in rival enterprises, were not giving their time to the affairs of the company, and dissensions existed among the officers and directors, so that the rights of plaintiff were jeopardized. The company was in imminent danger of insolvency. Its assets consisted largely of gas wells, and unless a receiver were appointed the company would be managed in the interest of its rivals, its assets would be exhausted and squandered, and the preferred stockholders would lose not only their dividends but their investment. The prayer was for judgment for $35, for the appointment of a receiver to conduct the business of the company, and for other relief.

The intervening petitions were of the same character.

The case may be disposed of upon the findings of fact. The evidence appears to have been voluminous, and little of it is abstracted. The plaintiff and the interveners appear to have been satisfied with the findings of fact and rested upon them. This court can not say that any others should have been made, and under the well-established rule the facts found embrace all the facts of the case open to consideration on appeal.

"Much testimony is quoted by both parties in support of their respective positions upon which neither the referee nor the court made findings. This court can consider the written instruments executed by the parties, other written documents, the pleadings, admissions and stipulations, and findings of fact. It can also consider the evidence upon any branch of the case which is all in depositions, as that procured by the plaintiff to explain his inability to produce the notes

and mortgages which Carolus had assumed. But it can not found its judgment upon oral testimony not reduced to findings of fact by the trial court. If the parties desired findings in respect to the matters covered by such testimony a request for further findings should. have been made. (*Shuler v. Lashhorn,* 67 Kan. 694, 74 Pac. 264.) Therefore many matters debated in the briefs are not open to consideration." (*Lynds v. Van Valkenburgh,* 77 Kan. 24, 33, 93 Pac. 615.)

The findings show that the corporation was organized in 1908, and was authorized to do business in Kansas in July, 1909. Fifty thousand dollars of the common stock were issued to S. R. Walker in exchange for oil and gas leases which cost him but a small sum of money and his labor in obtaining them. A decision of the board of directors that the leases were valuable was implied by the exchange of stock for them, and the charter of the company made such a decision conclusive. The preferred stock was sold at par. Officers of the company received a commission for disposing of this stock, and the finding is that payment of these commissions was unfair treatment of the purchasers of stock. There is no finding that payment for services of this character was *ultra vires,* or was not regularly provided for, or was accepted with knowledge of illegality. One share of common stock was given with each share of preferred stock. This action the court found to be proper if the board of directors deemed it for the best interest of the company, and there is no finding that the board of directors did not so regard it. Holders of preferred shares purchased other shares of common stock, so that instead of the corporation being controlled by holders of common stock only, the preferred stockholders owned 82 per cent of the common stock.

There is no finding that any officer or director of the corporation was guilty of any fraud or bad faith or breach of trust in any transaction alleged in the petition to be fraudulent, and excepting the criticism for

paying commissions on the sale of stock, a matter not alleged in the petition, there is no finding of fraud or bad faith or breach of trust in the conduct or management of any of the company's business. It is expressly found that the expenditures made in Morris and Chase counties and in Oklahoma, which consumed the proceeds of the sale of preferred stock not invested in the Muncie field, were made in good faith and without wrongful intent.

The court found that the laws of Oklahoma did not permit the defendant to hold the stock of the Mal-Millan company, but there is no finding that this fact had any effect whatever on the finances of the defendant. There is no finding that the state of Oklahoma ever complained, or that the operations of the defendant were embarrassed or the value of the investment reduced because of the prohibition. The defendant presents a forceful argument in favor of the legality of the purchase, and if a similar question should ever be presented to the courts of Oklahoma the decision may be interesting to ponder. The subject is of no importance now. The court found that the Mal-Millan company had no property of any value and was considerably in debt, and the investment may be considered as lost through poor business judgment, although the court made the following finding concerning it:

"The investment made in the stock of the Mal-Millan Company has not proven worthless, but the Mal-Millan Company is a going concern, producing the highest grade of crude petroleum found in Oklahoma, which commands the highest market price, and the same is being sold by said Mal-Millan Company as produced, and said Mal-Millan Company is rapidly paying off its debts and getting on a sound financial basis."

Some of the directors, how many is not stated, held interests in other gas companies, their entire attention was not devoted to the defendant's interests, and from about May 1, 1911, to January 4, 1912, there were dissensions among the directors. In August, 1911, the

.board of directors was increased from nine to eleven members. At the regular stockholders' meeting held on January 4, 1912, more than three months before the referee was appointed to hear the case and eighteen months before the court made its findings of fact, a new board of directors was elected in which no dissension existed, and of which no complaint is made. There is no finding that the business affairs of the defendant were being manipulated in the interest of rival companies by the old board, or were so neglected by the old board as to endanger the welfare of the company, or that the business policies pursued during the period when the directors were inharmonious were not for the best interest of all the stockholders. On the other hand, the findings show that the period from January 1, 1911, until the receiver was appointed in August, 1911, was the period of the company's greatest prosperity. Its earnings were brought up to about $3000 per month through the operation of its gas wells and of a pipe line which had been constructed with money borrowed for the purpose in 1910 with the approval of the entire board. The company was bringing in new gas wells, which policy the referee and the court recommended should be continued. It had rapidly liquidated the indebtedness incurred to build the pipe line and for development work, and was anticipating the payment of dividends which the petition itself alleged the defendant was able to pay. On August 7, 1911, eight days before this suit was commenced, the board of directors by unanimous vote authorized the secretary and treasurer to proceed with the payment of dividends on the preferred stock, and at the same meeting the board of directors by unanimous vote provided for the redemption of the preferred stock and dividends accrued thereon—a part of the relief the plaintiff prayed for— by the creation of a sinking fund for the purpose—a method which the court adopted.

There is no finding of culpable waste or squandering

·of assets.   The findings state that the proceeds of the
sale of the preferred stock were spent with entire
unanimity on the part of the board of directors.   The
corporation was engaged in prospecting for gas and oil.
It takes no finding by a court to establish the truth of
the fact that if wells bored prove to be dry there are
no returns.   The business judgment of the board of
directors, which the plaintiff could impugn only in case
of recklessness or extravagance equivalent to breach of
trust, is questioned in nothing but the Mal-Millan trans-
action, which occurred before the plaintiff acquired her
stock, and long before the action was commenced the
defendant had turned its energy to the development of
the Muncie field.   Instead of being in imminent danger
of insolvency when the receiver was appointed, the find-
ings show the defendant owed but $2500, while it
owned a pipe line, practically paid for, which cost $11,-
000 to build, and owned gas wells which produced a
total income of $16,378.19 between February 10 and
September 15 and were producing an income of $3000
per month.

At the time the resolution to pay dividends on the
preferred stock and to create a sinking fund for the re-
demption of the preferred stock were adopted the cor-
poration owed debts to the amount of about $5000,
which were due and payable.   It proceeded to pay out
in the liquidation of this indebtedness the sum of
$2893.85, which left $19.40 in the treasury.   This sum
passed into the hands of the receiver upon his appoint-
ment.

No demand was made by the plaintiff or by the in-
terveners or by any other stockholder of the company
upon the directors for payment of a dividend.   Very
soon after the suit was commenced the president of
the defendant offered personally to pay the plaintiff
her dividend but the offer was refused.

The foregoing constitutes a summary of the findings
of fact so far as they bear upon the appointment and

retention of the receiver. They do not sustain the allegations of the petition upon which the appointment of the receiver was based, and did not warrant the court in continuing to withhold the management of the corporation from those to whom the stockholders and the law committed it.

Generally a corporation may contract with its officers and directors if the transaction be untainted by bad faith. If payment of commissions by the old board of directors on the sale of stock constituted an actionable appropriation of the funds of the company, something which the court refrained from finding, the remedy was for the stockholders to request the board to compel restoration. Doubtless a request upon the new board of January, 1912, would have received attention, but if upon request the board of directors refused to act, the stockholders, or a single stockholder suing for all, could have brought the action. Taking the findings of fact as they stand, employment of the extraordinary remedy of absolute ouster of the old board for accepting commissions for selling stock would have been improper, and application of the remedy to the new board was without any justification.

Bad judgment in the Mal-Millan venture and ill success before the company returned to active exploitation of the Muncie field were not grounds for the appointment of a receiver. The right to supplant the board of directors acting in August, 1911, with a receiver depended upon the financial condition of the company at that time and upon what the policies in process of execution by the board of directors then in authority seemed to promise. Beginning with the determination to build the pipe line, the policies of the company so far as they are disclosed by the findings of fact were sound. Its directors were acting in good faith and within their lawful powers. No single transaction constituting a breach of trust or jeopardizing the welfare of the company is stated. The business

was prosperous, and the directorate, instead of denying claims of preferred stockholders, was recognizing them and preparing to satisfy them.

Conceding for present purposes that the plaintiff was entitled to receive a declared dividend on her stock and consequently was a creditor, her claim could not rise superior to the claims of creditors holding current obligations of the company which were due and payable. (*Branch v. Jesup,* 106 U. S. 468, 475.)   The discharge of those obligations could not constitute misconduct on the part of the defendant's managing officers, much less ground for peremptory removal.

Other supposed grounds for the receivership have been discussed in connection with the statement of the findings of fact.   The result is the receiver was improvidently appointed and his retention in office after the court discovered the facts was unjustifiable.

"Before a receiver can properly be appointed it is necessary that the plaintiff should have a probable cause of action against the defendant, and that the benefit to be derived from such cause of action might be lost or substantially impaired if the receiver were not appointed." (*Elwood v. National Bank,* 41 Kan. 475, syl. ¶ 4, 21 Pac. 673.)

"Dissatisfaction by a minority of the stockholders of a corporation with its management by the majority, in the absence of fraud or insolvency, is not sufficient to authorize the court to appoint a receiver at the instance of the minority." (*Fluker v. City Rly. Co.,* 48 Kan. 577, syl. ¶ 2, 30 Pac. 18.)

"The appointment of a receiver rests largely within the discretion of the court, and before it will take the property and business of a liquidating bank from the control of the directors into its own hands, upon the application of a stockholder, it must appear that the danger of loss or injury to the rights of the plaintiff is clearly proved, and the necessity and right for the appointment of a receiver free from reasonable doubt." (*Watkins v. National Bank,* 51 Kan. 254, syl. ¶ 4, 32 Pac. 914.)

The principle here stated applies with even greater

force when it is proposed to take the property and business of a solvent concern in promising circumstances out of the hands of its directors at the instance of a piqued stockholder holding but a slight fraction of the corporate stock.

The decision in the case of *Feess v. Bank,* 84 Kan. 828, 115 Pac. 563, covers all essential features of this case. In view of the full and clear statement of principles contained in that decision, it is held that the appointment and retention of the receiver in this case constituted an abuse of judicial discretion.

The plaintiff undertakes to distinguish the Feess case by pointing out that it involved the appointment of a receiver for a solvent bank, one of whose valuable assets was public confidence, and that the receiver was directed to wind up the affairs of the corporation. The effort to distinguish fails. General principles governing the duties of the courts of this state in respect to the appointment of receivers were stated, as the following quotations from the syllabus and the opinion show:

"Under the law a majority of the stockholders have the control of a corporation and the majority of its directors have power to determine the policy to be pursued and to manage and direct its affairs, and the minority must submit to their judgment so long as the majority act in good faith and within the limitation of the law." (Syl. ¶ 7.)

"It was held in *In re Lewis, Petitioner,* 52 Kan. 660, 35 Pac. 287, that under the code a receiver may be appointed at the suit of a stockholder 'where the business and affairs of a corporation have been so mismanaged that it has become insolvent, and where it is made to appear that all the officers and directors of the same have conspired together to divert its business to another company, dissipate its funds, and fraudulently absorb and apply its assets to the individual benefit of such officers.' (Syl. ¶ 1.) Conduct and conditions less serious than those enumerated would justify the appointment of a receiver, but it is a power that should be sparingly and cautiously exercised. It is a last-

resort provision and is only to be employed where there is a pressing necessity and no other adequate remedy is afforded. . . . The policy pursued in respect to loans and discounts seems to have been satisfactory to a majority of the directors and to those owning the controlling interest and more than nine-tenths of the capital stock. Those owning the majority of the stock claimed the right to control the management and policy of the bank, and a number of the matters of which complaint is made grew out of the differences of opinion in respect to what was the better policy. The law gives the majority of the stock-holders the right to control the policy and business of a corporation and the minority must submit to their decisions when the majority act in good faith and within their powers.

"It has been said that 'the very foundation principle of a corporation is that the majority of its stock-holders have the right to manage its affairs, so long as they keep within their charter rights. No principle of law is more firmly fixed in our jurisprudence than the one which declares that the courts will not interfere in matters involving merely the judgment of the majority in exercising control over corporate affairs.' " (pp. 836, 839.)

Other principles recognized and applied in the Feess case, but not stated so formally, are that business transactions which are merely unwise, irregularities and misconduct which are not so culpable as to jeopardize the corporation and the rights of stock-holders, and dissensions among directors, so long as a majority of them control, do not warrant the appointment of a receiver.

The plaintiff further seeks to distinguish the Feess case on the ground that the defendant here was insolvent, and to make the defendant insolvent the total issue of preferred stock in the sum of $50,000 is counted among its liabilities. Besides this, it is claimed the plaintiff was at all times merely a creditor of the corporation and not a stockholder, a view in which the district court concurred.

The plaintiff's stock certificate, copied above, evi-

denced the rights of a stockholder of the company and not the rights of a bondholder or creditor. The plaintiff purchased shares of the original capital stock of the company, received a certificate of stock, cast her fortunes with the company, took with it the risk of its ventures, and depended upon the net earnings of the company for returns upon her investment. She was not guaranteed a seven per cent annual dividend at all events. If there were no net earnings she received nothing and could not, as creditors may do, appropriate capital or general assets to the satisfaction of her claim. The fact that preferred stock had no vote and the corporation reserved the right to retire preferred stock by redeeming it did not change this express feature of the contract. So long as she remained a stockholder her only source of returns was net earnings, and if there were debts of the company she could not share such assets with creditors, in case of dissolution, but was merely preferred over common stockholders in case there were assets to distribute.

To sustain the contention that the plaintiff was merely a bondholder or creditor and not a stockholder of the corporation and was entitled to interest and not dividends, the plaintiff cites the text found in 10 Cyc. 574 concerning the doctrine that the guaranty of stated dividends creates an absolute debt. This text was deduced from three decisions. The first is *Williams v. Parker*, 136 Mass. 204. It is based upon a statute. The opinion reads:

"The question which underlies all others in this case is whether the guaranty that each share of the preferred stock 'shall receive semiannual dividends of four dollars on each share' is an absolute guaranty, or is conditional upon the earning of sufficient profits by the corporation. This depends upon the construction to be given to the St. of 1855, c. 143. No condition is expressed in the statute, and the natural meaning of the words used is, that the corporation is to guarantee to each holder of preferred stock that he shall, while the corporation does business, receive semiannual dividends

of four dollars on each share; so that, if the net earnings of the corporation are insufficient to pay such dividends, the corporation shall make good the difference out of any property it has. If the legislature had intended that the holders of preferred stock should only be entitled to a preference over the common stockholders in dividends to the extent of four dollars semiannually on each share, and should never receive a greater dividend than this, it would have been easy to express this intention accurately; and the only guaranty required of the corporation would have been, that it should appropriate the net earnings first to the payment of a dividend of four dollars semiannually upon each share of the preferred stock. . . . The cases cited, in which either the preferred stock was issued without statutory authority, or the dividends thereon by the terms of the promise or guaranty were held to be, either expressly or impliedly, payable out of the net earnings of the corporation, afford but little aid in the construction of the St. of 1855, c. 143." (pp. 206, 207.)

The plaintiff's certificate of stock in express terms conditioned payment of dividends on net earnings of the corporation.

The next case cited is *W. C. & Phila. Railroad Co. v. Jackson,* 77 Pa. St. 321. It arose under a special statute passed to aid a railroad company which required more money to complete its road than could be realized from the sale of authorized stock and bonds. The act recited, "that making a floating debt for that purpose would be onerous to the management of the road and probably unduly hazard the interest of the stockholders" (p. 322), and provided for an issue of preferred stock bearing eight per cent annual dividends payable out of net earnings and redeemable after one year when the profits of the road would justify. The court treated this act as one to enable a corporation to borrow needed money, and said:

"The payment for his shares by Mr. Gray, and the issuing of the certificates to him by the defendant, made as complete a contract as if he had been a purchaser of bonds instead of a subscriber for stock. And his contract rights were precisely defined by the Act of 1855.

25—94 KAN.

In effect, it was an agreement for the advance of money to an embarrassed railroad company. A corporation may issue new shares and give them a preference as a mode of borrowing money, where it has power to borrow on bond and mortgage, as preferred stock is only a form of mortgage." (p. 327.)

In the case of *Sternbergh, Appellant, v. Brock,* 225 Pa. St. 279, 74 Atl. 166, the supreme court of Pennsylvania said of this decision:

"In *West Chester, etc., R. R. Co. v. Jackson,* 77 Pa. 321, a loose expression was used, when it was said that 'preferred stock is only a form of mortgage.' Whatever the extent of the preference in that case may have been, speaking generally, stock, whether it be common or preferred, does not represent indebtedness; its possession means ownership of the company." (p. 284.)

The last case cited in support of the Cyc. text is that of *Burt v. Rattle,* 31 Ohio St. 116. It involved the interpretation of a statute which the court regarded as one to enable corporations of a certain class to borrow money by means of preferred stock. The statute contained a provision relieving holders of preferred stock from liability for debts of the corporation. The constitution of the state imposed individual liability for debts upon stockholders, and if holders of preferred stock issued under the statute were stockholders the statute was unconstitutional. If they were creditors the statute was valid. The preferred stock which was issued was secured by mortgage. The court held that the statute was valid and the preferred stockholders were creditors. Very clearly this decision evidences no general rule, and the position of the supreme court of Ohio on the subject under consideration must be sought for elsewhere. It may be found in the case of *Miller, Executor, v. Ratterman, Treas.,* 47 Ohio St. 141, 24 N. E. 496. A portion of the opinion reads:

"The question in the case is, whether the certificates are certificates of stock or certificates of indebtedness? . . . The relation of a holder of preferred stock is, in some of its aspects, similar to that of a creditor,

but he is not a creditor save as to dividends after the same are declared. Nor does he sustain a dual relation to the corporation. He is either a stockholder or a creditor; he cannot, by virtue of the same certificate, be both. If the former, he takes a risk in the concerns of the company, not only as to dividends and a proportion of assets on the dissolution of the company, but as to the statutory liability for debts in case the corporation becomes insolvent; if the latter, he takes no interest in the company's affairs, is not concerned in its property, or profits as such, but his whole right is to receive agreed compensation for the use of the money he furnishes, and the return of the principal when due. Whether he is the one or the other depends upon a proper construction of the contract he holds with the company. . . . As supporting the claim that it was not stock that was issued but certificates of indebtedness, special attention is called in argument to those portions of the certificates which provide that holders shall not vote upon them at any meeting of the holders of the capital stock of the company; that the rights of the holders to the dividends are guaranteed, and are to be secured by mortgage on the property, rights and income; that no further or other mortgage shall thereafter be made to the prejudice of the holders of the preferred stock; that the dividends are guaranteed by The Cincinnati, Hamilton & Dayton company, which company had executed a mortgage to Stanley Matthews, trustee, to secure the payment of dividends." (pp. 154, 155.)

The decision was that the certificates were certificates of stock and not certificates of indebtedness. In discussing the features of the certificates which are similar to those contained in the plaintiff's certificate, the court said:

"It further stipulates that the holders of the certificates of stock shall not have or exercise the right to vote the same at the meeting of the stockholders of the company, thus indicating that it was stock they intended to authorize the issue of and not certificates of indebtedness, for the inhibition against voting would be wholly useless had it been intended that the holders should become creditors. The provision is not unusual. It is sometimes found in the statute itself. . . . Nor

is it, in this instance unreasonable. The promise to the preferred stockholders was to award them the first net earnings, the holders of the common stock to share in such of the net earnings as they might, by good management, be able to make over and above the eight per cent. As the burden was upon the common stockholders, the power to manage might fairly be left with them. In any view, it is fair to treat the proviso as but an arrangement between two classes of stockholders which did not concern the public. It is true that one characteristic of stock generally is that it can be voted upon. But this is not essential. . . . Nor did the stipulation guaranteeing to the holders of the preferred stock payment of dividends thereon negative the idea that they were stockholders. It was not a stipulation to pay dividends in any event, but a stipulation to pay only out of surplus profits, for the company must be presumed to have proceeded in view of the terms of the second section of the act referred to, and the general rule of law on the subject. That rule is that payment of dividends to preferred stockholders differs from such payment to the holders of common stock only in that they are entitled to dividends in priority to any dividends upon the common stock. Dividends to either are to come from one common source, to wit: from funds properly applicable to the payment of dividends, that is to say, net earnings. In the nature of things this must be so. As well might one member of a partnership be permitted to appropriate to his own use assets of the firm to the prejudice of creditors, as for a stockholder of a corporation to do it. A contract to permit this to be done would be contrary to public policy and void." (pp. 157, 158.)

Notes reviewing cases bearing upon this subject may be found in 27 L. R. A. 136 and 73 Am. St. Rep. 227. Some leading cases on the subject are the following: *Hamlin v. Toledo, St. L. & K. C. R. Co.,* 78 Fed. 664; *Heller v. Marine Bank,* 89 Md. 602, 43 Atl. 800; *Field v. Lamson & Goodnow Manuf. Co.,* 162 Mass. 388, 38 N. E. 1126; *Branch v. Jesup,* 106 U. S. 468, 475; *Warren v. King,* 108 U. S. 389, 398; *Hamlin v. Continental Trust Company,* 47 U. S. App. 422, 435; *Chaffee v. Railroad Co.,* 55 Vt. 110.

The plaintiff's stock falls within the general description of preferred stock given in 10 Cyc. 568:

. "Preferred stock is not an indebtedness of the corporation, or an absolute agreement to pay certain dividends upon its shares, but is merely a pledge of its profits in favor of certain shares in preference to the others, in other words an agreement to give a preference to particular shares over the other shares in the division of profits, but only in case there shall be profits to divide. Hence if it appears in any case that no profits have been earned the holders of preferred stock cannot maintain actions against the company to enforce payment of the guaranteed dividends."

The result is the plaintiff was not a creditor of the corporation by virtue of her purchase of preferred stock.

The district court misconceived the law on this subject, regarded the preferred stock as a debt, and held dividends on the preferred stock to be "interest," as appears by the following conclusion of law:

"That at the commencement of this suit the defendant was indebted to plaintiff and said interveners for accrued interest on their said shares of preferred stock as follows, to-wit: To plaintiff in the sum of $35.00; to D. P. Smyers in the sum of $70.00; to J. M. Smythe in the sum of $7.00; to Harry Lee Inscho in the sum of $35.00; and to other holders of its preferred stock of the defendant in the various sums of money which had accrued as interest on said preferred stock up to the commencement of this suit, all aggregating the sum of $1,373.75."

On August 7, 1911, the board of directors of the defendant adopted the following resolutions:

"*Resolved*, that the Mid-Continent Development Company hereby exercises its option and obligates itself to redeem the preferred stock of this company by paying par value thereof with accrued dividends at the rate of 7% from date of issuance."

"*Resolved*, that the Mid-Continent Development Company shall redeem the preferred stock of this company with accrued dividends; and 75% of the gross

earnings, which is from now on, be formed into a sinking fund for that purpose to be known as a preferred stock fund and to be kept and maintained for that purpose, which shall be apportioned to the preferred stockholders as often as 25% of the entire amount due is accumulated and this process of distribution shall continue until the entire amount of the preferred stock and accrued dividends shall have been paid in full."

The court held that these resolutions constituted a contract on the part of the defendant to redeem the preferred stock and to create a sinking fund for that purpose in accordance with the second resolution. Possibly this was true as to those preferred stockholders only who assented to the arrangement. However this may be, the two resolutions must be read together, and when so construed they do nothing more than pledge seventy-five per cent of the gross earnings accruing "from now on" to the redemption of preferred stock. The portion of the gross earnings so set apart was to be apportioned as often as twenty-five per cent of the preferred stock with accrued dividends was accumulated, until all preferred stockholders were paid in full. Holders of preferred stock remained stockholders having no right to demand redemption until an apportionment of accrued earnings was made, and then became creditors only with respect to the apportionment. Any other interpretation of the resolutions perverts their manifest purpose. The only enforceable obligation created by the resolution was to create the sinking fund and make apportionments, and it is idle to say that by virtue of the resolutions the entire issue of $50,000 of preferred stock became a liability of the company to be taken into consideration in determining solvency. It is not claimed that any apportionment of gross earnings was possible within the eight days which elapsed between the adoption of the resolutions and the appointment of the receiver. The bookkeeping liability of a corporation on its capital stock is not a feature in determining solvency, which refers to ability to sat-

isfy creditors. It is not claimed that dividends due on the preferred stock would so deplete assets as to render the corporation insolvent. The express claim is there existed net earnings to pay them. The corporation was solvent, and the claim just stated will now be considered.

The plaintiff in her brief properly describes the action as an equitable one to subject the property of the defendant to payment of her claims as a preferred stockholder.

The dividend assured being payable "yearly . . . from time of issuance" at a stated rate per cent upon the amount of stock, the plaintiff was entitled to a return upon her stock for each year. That is, the dividends were cumulative. The decisions are quite uniform to this effect. The case of *Fidelity Tr. Co. v. Lehigh Val. R. R. Co., Appellant*, 215 Pa. St. 610, 64 Atl. 829, states the principles and refers to a number of authorities.

The dividend claimed by the plaintiff was payable out of net earnings only.

The findings of fact read as follows:

"5. Finding its operations in Oklahoma wholly unremunerative, the defendant resumed work in Wyandotte County, Kansas, in the Muncie field. The defendant found it necessary to build a pipe line for the purpose of connecting the company's wells with certain manufacturing plants, to whom the defendant expected to sell its gas. Up to that time the entire $50,000 of preferred stock had been sold and the money spent. The defendant, therefore, had to borrow and did borrow about $11,000, and used it for the purpose of building said pipe line.

"7. . . . The borrowing of the $11,000, as above stated, was a necessity. This borrowed money was used, as aforesaid, in building said pipe line in the fall and winter of 1910. This line was built with the expectation of furnishing gas to four prospective customers, namely: United Zinc & Chemical Company, the Santa Fe's Icing Company's Plant, the Santa Fe Elevator and the town of Turner, with whom the defendant had contracts for such purpose.

"8. The defendant continued to drill new wells, and the Chemical Company to use more gas until on or about the 10th of August, 1911, the Chemical Company paid to the Development Company about $3,000 in payment of gas consumed during the preceding thirty days. Between February 10th and September 15th, 1911, the defendant received from the Chemical Company for gas the total sum of $16,378.19, and the defendant company applied this money on the repayment of the money borrowed to build the pipe line, in drilling wells and connecting them with the pipe line and in paying the general expenses of the Development Company. This $16,378.19 is the only income ever received by the defendant. The building of the pipe line, the drilling of other wells and connecting them with the pipe line was development work. The money made by the defendant from the sale of its gas in the year 1911 was used, in a great measure, for development work and could properly have been used for the payment, in part at least, of the accrued dividends on the preferred stock.

"11. The gross receipts of sales of gas up to the 15th day of August, 1911, were about $2800 per month; the net receipts were about $2000 per month. As the gas yield in the Muncie field is decreasing in quantity, the Muncie gas field being a shallow one, your Referee considers it good business management and in the interests of the stockholders to drill as much as a well per month. This would cost about $750 or more. The operating expenses would be $500. So a fair estimate of the amount of money which could be devoted to the payment of preferred stock and dividends would be about $1500 per month, or one-half of the gross receipts."

The findings further state that when the resolutions of August 7, 1911, were adopted the company owed $5000, which was then due and payable, which indebtedness had been contracted for building the pipe line, drilling wells, and current expenses. A part of this indebtedness consisted of three promissory notes aggregating $1500, current accounts amounting to $400, and a disputed account of about $600.

The latter part of finding number 8, that the money made by the defendant from the sale of gas in the year 1911 was used in a great measure for development work, and that such money could have been used, in

part at least, to pay dividends on preferred stock, states conclusions drawn from the specific facts found. Unless consistent with the specific facts found the conclusions are valueless.

Analyzing the findings of fact, it appears that the total earnings up to September 15, a month after the receiver was appointed, were $16,378.19. What the earnings were up to August 15, when the action was commenced, or up to August 7, when the resolutions were adopted, is not stated. If it be assumed that the earnings for the month preceding September 15 were equal to the average, about $2800, earnings up to the time the action was commenced were about $13,578.19. When the action was commenced the indebtedness of the company was $2500. One thousand dollars of this sum was upon current accounts and so was not a part of the debt incurred for building the pipe line. Not more than $1500 of the money borrowed to build the pipe line remained unpaid. Therefore something like $9500 of the money borrowed to build the pipe line had been paid. Gross receipts from the sale of gas averaged $2800 per month, and net receipts averaged $2000 per month. Average expenses per month were therefore $800. The total expenses for six months were $4800, and for seven months were $5600. Using the smaller sum, the money paid on the pipe-line debt and the money necessary for current expenses would amount to $14,300, or more than the receipts for the period, to say nothing of expenditures for drilling new wells and net earnings available for the payment of dividends.

The findings state the sum of $16,378.19 received from the chemical company was the only income ever received. What became of the contracts with the Santa Fe Icing Company, the Santa Fe Elevator Company and the town of Turner is not disclosed, and there is no finding that gas sold had not all been paid for. If, however, the average income were $2800 per month, as stated in finding number 11, and the statement is repeated in finding number 15, not copied above, the in-

come from February 10 to August 15 should have been $16,800, and the income to September 15 should have been $19,600.

The result is the findings convict themselves of utter unreliability.

The definition of the term "development work," inserted quite unnecessarily in the findings, may be accepted. The building of the pipe line was development work, but $11,000 of borrowed money were used to build the pipe line. This borrowed money constituted a debt of the corporation incurred antecedent to earnings and in order that there might be earnings. Earnings used to pay that debt were not spent in development work and can not be counted as a part of the income spent "in a great measure for development work." Suppose the plaintiff were the holder of a certificate of indebtedness, as she claims to be, and that her money had been used to build the pipe line, earnings used to repay her would not be used in development work but in discharging her debt. In finding number 11 it is said that operating expenses for the future consistent with good business management would be about $500 per month. As already shown, the finding is that operating expenses were about $800 per month. Payments for gas sold appear to have been made about the 10th of the month for the preceding thirty days. There must have been operating expenses preceding such payments. Counting from January 1 to August 15 at the rate of $500 per month, operating expenses would amount to $3750. But using the dates specified in the findings, operating expenses from February 10 to August 15 would amount to $3000. This sum added to the sum deduced from the findings as paid on the pipe-line debt makes $12,500 paid out for other than development work. If, therefore, the operating expenses be figured at what they should have been instead of at what they actually were, still finding number 8 that the money made from

the sale of gas was used in great measure for development work is untrue.

There is no finding whatever of the number of new wells brought in by the defendant in 1911, or of their cost, or of the cost of connecting them with the pipe line—one of the important subjects of the litigation. It does appear from the financial result of bringing in new wells that the income rose to its highest point, $3000 per month, on August 10. For bringing in new wells the defendant was sued, a receiver was appointed, and judgment was rendered against it. Yet the referee and the court find that the policy of drilling new wells ought to be continued and that earnings ought to be withheld from preferred stockholders for their own benefit sufficient to bring in one new well a month at a cost of $750 or more. If from January to August one new well a month were brought in at a cost of $750 per well, the sum of $6000 was expended in doing that which was inequitable and vicious for the board of directors to do, but which was entirely equitable and just for the receiver to do.

It is manifest that a judgment based upon findings of fact of this character can not stand.

Whatever the income of the defendant may have been, the findings do show that it was all spent to repay the money borrowed to build the pipe line, to drill wells and to connect them with the pipe line, and to pay general expenses. The existence or nonexistence of net earnings may be determined from these facts.

The case of *Burk v. Ottawa Gas Co.*, 87 Kan. 6, 123 Pac. 857, involved the equitable right of a stockholder to enforce payment of noncumulative dividends on preferred stock payable out of net profits. The opinion delivered in that case reads as follows:

"The directors of the corporation owed a positive duty to pay a dividend to the preferred stockholders whenever in any year there were net profits available. The funds that might be used for that purpose could not rightfully be expended for extensions merely for

the benefit of the business, nor could they be withheld to meet the expenses of the next year. Inasmuch as the only possible source of profit to the preferred stockholder from his investment is the distribution of earnings in the year in which they accrue, he has a right to insist that an accounting shall be taken annually, and that the surplus of one year, available for a dividend, shall not be carried over to meet a possible deficiency of the next.

"The holder of the preferred stock, however, is not generally a creditor until a dividend is declared, but as equity regards as done that which ought to be done, if under the facts of this case a dividend or dividends ought to have been declared in a certain year or years to such stockholders, they should be regarded as creditors to such extent from such time or times, in this equitable action. The company's contract with the preferred stockholder is not to pay him at all events the amount of the net profits of each year up to six per cent, but to declare a dividend on that basis. The obligation to declare a dividend arises only when there is (or as to the stockholder ought to be) money available with which to pay it. Although the business of the year may show the earning of net profits, counting as gain what has gone into betterments, yet if the money taken in has been expended in performance of a duty superior to that owed to the stockholder, no obligation to declare a dividend can arise." (p. 16.)

For obvious reasons the fact that dividends are cumulative and so are not lost for failure to declare them each year may be taken into account in determining whether or not there ought to be money available with which to pay them and in estimating the duties of the corporation to stockholders, and to others, such as creditors.

In the Burk case the only debts of the corporation were fixed charges, so that the rule stated in the syllabus for computing the net profits of the Ottawa Gas Company did not refer to the payment of other debts out of earnings. In the opinion, however, principles general in their application were stated. Although the terms "net profits" and "surplus" were employed,

and those terms are technically distinguishable from "net earnings," they were not used in the technical sense, and referred to the same fund which in this case is denominated "net earnings." In the Burk case a superior duty was owed to patrons entitled to extensions. In this case a superior duty was owed to creditors.

The effort of the plaintiff to establish her position as a creditor holding simply a certificate of indebtedness is a tacit acknowledgment that the right of a stockholder to earnings is inferior to the rights of creditors. The plaintiff's preference was merely the preference of one class of stockholders over another class, and no stockholder, preferred or common, could claim as a dividend any portion of earnings necessary to satisfy the matured demands of ordinary general creditors.

It is not necessary to go beyond the plaintiff's brief for authorities on this subject. Speaking generally, net earnings are what remain of gross receipts after deducting the expenses of producing them. Speaking generally, net earnings can not be withheld to liquidate bonded indebtedness maturing in the future, nor other indebtedness in its nature permanent, nor to liquidate floating indebtedness properly convertible into bonded indebtedness, and a situation might arise in which a corporation ought to borrow money to pay preferred dividends. But as was said in the case of *Hazeltine v. Railroad Co.,* 79 Maine, 411, 10 Atl. 328, cited by the plaintiff, the question whether money on hand shall be regarded as net earnings "depends usually on several considerations—is a relative question—not always susceptible of clear demonstration—and is a matter to a considerable extent of good judgment in conducting the company's business and of good faith in upholding its contracts on the part of directors." (p. 416.)

In the case of *Railroad Co. v. Belfast,* 77 Maine, 445,

1 Atl. 362, a case cited by the plaintiff involving the right to a noncumulative dividend, the same court said:

"The difficulty is in deciding what should be considered as net earnings; that is, net earnings such as are applicable to dividends. In a general sense, net earnings are the gross receipts less the expenses of operating the road to earn such receipts. But several kinds of charges must first come out of net earnings before dividends are declared. The creditor comes in for consideration before the stockholder. The property of a corporation is a trust fund pledged for the payment of its debts. Therefore, if there is a bonded, funded, permanent or standing debt, the interest on it must be reckoned out of net earnings. If there is a floating debt, which it is not wise and prudent to place in the form of a funded debt, or to postpone for later payment, that should also be paid. If the financial situation of the company is such as to render it expedient to commence or continue the scheme of a sinking fund for the extinguishment of the company's indebtedness some day or other, an annual contribution out of the net earnings for that purpose would be reasonable." (p. 452.)

Numerous citations of decisions by federal courts appear in the plaintiff's brief, and the rule for estimating net earnings applied by those courts is clear.

"A certificate for shares of stock in a railroad corporation declared that such stock should be entitled to preferred dividends, out of the net earnings, not to exceed a specified rate, after payment of mortgage interest in full. After the certificate was issued, the corporation borrowed money and issued bonds therefor bearing interest, and also took leases, on rent, of connecting railroads: *Held*, that the holder of the certificate was not entitled to be paid a dividend, before payment of the interest on such bonds, or of such rent." (*St. John v. The Erie Railway Company*, 10 Blatch. [U. S. Cir. Ct.] 271, syl.)

This decision was affirmed in the case of *St. John v. Erie Railway Company*, 89 U. S. 136.

In the case of *Union Pacific R. R. Co. v. United States*, 99 U. S. 402, the rule was extended to allow payment for permanent improvements, consisting of

station buildings, shops, etc., out of earnings. The syllabus reads:

"The 'earnings' of the road include all the receipts arising from the company's operations as a railroad company, but not those from the public lands granted, nor fictitious receipts for the transportation of its own property. 'Net earnings,' within the meaning of the law, are ascertained by deducting from the gross earnings all the ordinary expenses of organization and of operating the road, and expenditures made *bona fide* in improvements, and paid out of earnings, and not by the issue of bonds or stock." (Syl. ¶ 2.)

In the case of *Warren v. King,* 108 U. S. 389, it was said:

"Thus he can have no income on his stock unless there are net earnings. Those net earnings are what is left after paying current expenses and interest on debt and everything else which the stockholders, preferred and common, as a body corporate, are liable to pay." (p. 398.)

The brief for the plaintiff directs attention to the rules announced by the highest courts of Connecticut and Massachusetts. The following quotations indicate the views of those courts.

"The general rule, even in the absence of any statute on the subject, is that dividends, in a going concern, can be properly declared and paid only out of profits, and not out of capital, or assets required for the security and payment of creditors. Morawetz on Private Corporations (1st ed.), § 344; Redfield on Railways, § 240; 2 Thompson on Corporations, § 2152. This rule applies whether the stock upon which the dividend is declared is common stock or, as in this case, preferred stock. *Warren v. King,* 108 U. S. 389; *Cotting v. New York & N. E. R. Co.,* 56 Conn. 156-169." (*Davenport, Receiver, v. Lines,* 72 Conn. 118, 128, 44 Atl. 17.)

"A corporation, under statutory authority, issued preferred stock, the certificates of which provided that the holders thereof were entitled to dividends thereon annually out of net profits, in preference to the holders of any other stock of the corporation, to the amount of a certain rate per cent;   .   .   .   The capital of the

corporation became seriously impaired, and its indebtedness amounted to a large sum, and was payable on demand or on short time. The assets, though appearing to be largely in excess of the indebtedness, would have suffered a very great shrinkage from the valuation put upon them if disposed of to pay debts or to close up the business. During a portion of the time only were there net profits sufficient to warrant the payment of dividends on the preferred stock at the rate named in the certificates. The directors of the corporation refused to declare dividends, in part because they believed that it would endanger the ability of the corporation to pay its debts, and in part because they did not deem it proper so to do on account of the impairment of the capital. *Held,* that the directors did not appear so plainly to have acted in disregard of the rights of the preferred stockholders as to justify the interference of a court of equity." (*Field v. Lamson & Goodnow Manuf. Co.,* 162 Mass. 388, syl. ¶ 4, 38 N. E. 1126.)

Citations might be extended indefinitely, but it is not necessary. In the case of *Ryan, et al., v. L. A. & N. W. Rly. Co., et al.,* 21 Kan. 365, this court said:

"The claims of stockholders in a corporation are subordinate to the claims of creditors, and the stockholders are not entitled to any division of the profits and moneys of a corporation until all its debts are paid." (Syl. ¶ 7.)

The origin of the pipe-line debt was such that it was justly entitled to absorb earnings before stockholders received dividends. It appears to have been payable as the company had funds and what there was left of it in August, 1911, was due. Without elaborating further, the board of directors did not disregard the rights of the preferred stockholders by paying off the pipe-line debt.

The court knows what everybody knows, that the flow of gas from natural gas wells tends to diminish. The bringing in of new wells is not only a necessity to enable a producer to utilize his plant and fulfill his contracts with consumers, but failure to adopt such a policy means ultimate extinction of his business. In such a situation the drilling of new wells is a part of the cost of producing the mineral sold and is properly

chargeable to expense. Finding number 11 shows that to have been the situation in the Muncie field. If wells had been brought in and then not used, but simply capped and laid by for future use, the anology of investing earnings in permanent improvements to the disadvantage of stockholders entitled to annual dividends would hold. But the defendant was simply getting the product of its gas field to market at the cost of drilling new wells. With the pipe-line debt paid dividends were certain, and the plaintiff could lose nothing because her dividends were cumulative. Indeed, the plaintiff would have had fair ground for charging the directors of the defendant with slack management if they had not developed the field and kept up production by drilling new wells. There is no place in the figures disclosed by the findings for excessive expenditures in drilling new wells.

Finding No. 8 being that the total sum earned by the company was expended to repay the money to build the pipe line, to drill wells and connect them with the pipe line, and to pay general expenses, there were no net earnings to distribute.

At the directors' meeting of August 7, the following resolution was adopted:

"*Resolved,* That the directors hereby authorize the secretary and treasurer to proceed with the payment of the fixed yearly dividend from date of issuance at 7% and prepare a list of the preferred stockholders with the amount due to each."

At that time there was a little more than $2900 in the treasury, which was at once paid out on the debts of the company. The money was not net earnings, and the duty to pay the debts of the company was superior to the duty to pay dividends on the preferred stock.

The judgment of the district court is reversed and the cause is remanded with direction to sustain the motion to discharge the receiver, sustain the motion for judgment in favor of the defendant on the findings of fact, and render judgment in favor of the defendant against the plaintiff and the interveners for costs.